DAEWOO ELECTRONICS COMPANY, LTD., et. al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Court No. 85–01–00140.

United States Court of International Trade.

April 3, 1989.

See also, C.I.T., 655 F.Supp. 508.

Dow, Lohnes and Albertson, William Silverman, Michael P. House, Ryan Trainer, and Douglas J. Heffner, Washington, D.C., for plaintiffs Gold Star Co., Ltd. and Gold Star Electronics Intern., Inc.

Frederick L. Ikenson, P.C., Frederick L. Ikenson and J. Eric Nissley, Washington, D.C., for plaintiff Zenith Electronics Corp.

Collier, Shannon, Rill & Scott, Patrick B. Fazzone and Paul D. Cullen, Washington, D.C., for plaintiffs Independent Radionic Workers of America, et al.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Jeanne E. Davidson, Civ. Div., U.S. Dept. of Justice (Robert E. Nielson, of counsel), U.S. Dept. of Commerce, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

WATSON, Judge:

Plaintiffs in this consolidated action challenge the determinations of the International Trade Administration of the U.S. Department of Commerce (ITA or Commerce) in the final results of the first administrative review with regard to importations of color television receivers (CTRs) from Korea, which were published on December 28, 1984 (49 Fed.Reg. 50420).

The importations of CTRs from Korea are subject to administrative review under Section 751(a) of the Tariff Act of 1930, as amended, (the Act) 19 U.S.C. § 1675(a) as a result of the antidumping order of March 1, 1984 (49 Fed.Reg. 7620).

Plaintiffs Daewoo Electronics Co., Ltd. and Daewoo Electronic Corporation of America, Inc. (collectively "Daewoo"), Gold Star Co., Ltd. and Gold Star Electronics International, Inc. (collectively, "Gold Star"), Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung") are foreign manufacturers and exporters of CTRs from Korea, and respondents in the administrative proceedings subject to this judicial review.[1]

Oppenheimer Wolff & Donnelly, David A. Gantz, Timothy A. Harr, and Jong–Dae Lee, Washington, D.C., for plaintiffs Daewoo Electronics Co., Ltd. and Daewoo Electronics Corp. of America, Inc.

Arnold & Porter, Thomas B. Eilner, Sukhan Kim, M. Howard Morse and Jeffrey M. Winton, Washington, D.C., for plaintiffs Samsung Electronics, Co., Ltd. and Samsung Electronics America, Inc.

1. Plaintiff Daewoo is a successor to Taihan Electric Wire Co., Ltd., which was a named respondent in the antidumping petition, and which was later acquired by Daewoo during the initial

Zenith Electronics Corporation ("Zenith") and the Independent Radionic Workers of America, the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL–CIO–CLC, the International Brotherhood of Electrical Workers, and the Industrial Union Department AFL–CIO (collectively the "Unions") are the defendant-intervenors, as well as plaintiffs in a consolidated action challenging the final results of this administrative review. Zenith and Unions are domestic interested parties who participated in the proceeding below as petitioners. The Court has jurisdiction over these consolidated actions pursuant to 28 U.S.C. § 1581(c).

## BACKGROUND

Within a few days after publication of the antidumping order, plaintiffs Gold Star and Samsung requested Commerce to conduct an expedited review and early determination of dumping duties pursuant to Section 736(c) of the Act, 19 U.S.C. § 1673e(c).[2]

The requests to conduct a Section 736(c) review was accompanied by the information required under that section in order to determine the foreign market value and the United States price of the entries made between October 19, 1983, the date of the preliminary determination of the ITA when liquidation of the subject merchandise became suspended, and April 25, 1984, the

date of the final injury determination of the International Trade Commission (ITC).

Commerce denied parties' request to conduct an expedited review pursuant to Section 736(c) of the Act. Instead, the ITA undertook to conduct its regular Section 751(a) administrative review on an expedited basis. The ITA did not issue its usual Section 751 instructions and questionnaires requesting the appropriate sales information to Gold Star and Samsung, but proceeded to use sales information which had been provided by these parties to accompany their request for a Section 736(c) review. In view of the fact that Daewoo had not applied for a Section 736(c) review and did not provide the sales information which must accompany such requests, the ITA issued a questionnaire with instructions to Daewoo requesting the sales data for the same period.

According to the expedited schedule initially established by the ITA, the final results of this administrative review were due by October 31, 1984. Commerce proceeded to conduct verifications of plaintiffs' data in July, 1984, and published its preliminary results of this administrative review on September 12, 1984.

In response to requests from the parties, the ITA extended its deadline for completion of this review to December 15, 1984. The ITA provided the parties with an opportunity to submit additional information, and announced that it would conduct a

investigation. The antidumping order did not establish a company-specific deposit rate applicable to imports from Daewoo and, therefore, these imports were entered under the rates applicable to all other companies which were not specifically investigated.

2. 19 U.S.C. § 1673e(c) provides:
(c) **Security in lieu of estimated duty pending early determination of duty.—**
(1) **Condition for waiver of deposit of estimated duties.—**
The administering authority may permit, for not more than 90 days after the date of publication of an order under subsection (a) of this section, the posting of a bond or other security in lieu of the deposit of estimated antidumping duties required under subsection (a)(3) of this section if, on the basis of information presented to it by any manufacturer, producer, or exporter in such form and with-

in such time as it may require, it is satisfied that it will be able to determine, within 90 days after the date of publication of an order under subsection (a) of this section, the foreign market value and the United States price for all merchandise of such manufacturer, producer, or exporter described in that order which was entered, or withdrawn from warehouse, for consumption on or after the date of publication of—
(A) an affirmative preliminary determination by the administering authority under Section 1673b(b) or this title, or
(B) if its determination under section 1673b(b) of this title was negative, an affirmative final determination by the administering authority under section 1673d(a) of this title and before the date of publication of the affirmative final determination by the Commission under section 1673d(b) of this title.

second verification. The ITA conducted a second verification of plaintiffs' information in November, 1984. Commerce issued a "revised preliminary results", which were not published in the Federal Register, but consisted of the revised computer printout and a memorandum dated November 28, 1984.

The ITA published the final results of this administrative review on December 28, · 1984 (49 Fed.Reg. 50420). The final results of this administrative review established the weighted averaged dumping margins of 12.23, 7.47 and 14.88 percent for plaintiffs Samsung, Gold Star and Daewoo, respectively.

Plaintiffs challenge the final results of this administrative review on grounds which involve the calculation of Foreign Market Value (FMV), the calculation of United States prices, and matters of administrative procedure.

## I. PLAINTIFFS' ARGUMENTS WITH REGARD TO FOREIGN MARKET VALUE.

(a) Samsung alleges that the ITA erred in refusing to adjust FMV for bad debt expenses, which plaintiff experienced in the Korean market during this administrative review, in violation of 19 U.S.C. § 1677b(a)(4)(B).

(b) Daewoo alleges that the ITA improperly excluded certain below costs sales from calculation of FMV in violation of 19 U.S.C. § 1677b(b)(2).

(c) Plaintiffs allege that in making a difference-in-merchandise adjustment to FMV for differences in duties incurred on some imported parts of the merchandise, Commerce erred in calculating and deducting the amounts of import duties from home market sales, instead of comparing FMV to the U.S. prices on a duty-included basis.

(d) Daewoo and Samsung allege that in making the adjustments for differences in credit expenses between the U.S. and home market, Commerce erred in using rates of credit based on the best information available, instead of applying the actual rates of credit which were experienced by plaintiffs in the home market.

(e) Samsung alleges that the ITA failed to make appropriate adjustments to FMV for warranty expenses and volume rebates which were substantiated and duly verified.

(f) Daewoo contends that the ITA failed to include the amount of selling commissions incurred in the United States in its calculations of the off-set deductions for indirect selling expenses from FMV.

## II. PLAINTIFFS' ARGUMENTS WITH REGARD TO THE UNITED STATES PRICE.

(g) Plaintiffs allege that the ITA erred in determining that the account receivables from their related companies represent deductible selling expenses which were assumed by such related companies on behalf of the U.S. exporters.

(h) Samsung alleges that Commerce erred in treating the legal fees, which were incurred during this review period in connection with the previous antidumping proceeding as selling expenses deductible from the U.S. price.

(i) Plaintiffs claim that the ITA erred in treating their U.S. export-related selling expenses, which were not incurred within the territory of the United States, as deductible from the U.S. price under 19 U.S.C. § 1677a(e)(2).

(j) Plaintiffs allege that the ITA erred in adjusting the exporter's sales price for imputed credit expenses associated with inventory carrying costs which are incurred between the time the merchandise is exported from Korea and the time it is sold by their U.S. subsidiaries to unrelated purchasers in the United States.

## III. PLAINTIFFS' ARGUMENTS WITH REGARD TO ADMINISTRATIVE PROCEDURE.

(k) Plaintiffs contend that Section 737(a) of the Act, 19 U.S.C. § 1673f(a) imposes a limitation on the amount of antidumping duties to be assessed as a result of this administrative review, so that they may not exceed the estimated rates of antidumping duties which were

established in the preliminary determination of the initial less-than-fair value (LTFV) investigation of the ITA.

(1) Plaintiffs contend that the ITA improperly refused to disclose certain computer printouts containing calculations of the margins for the final results of this administrative review and request the Court to address this issue, notwithstanding their subsequent access to the printouts as a result of bringing this action.

(m) Plaintiffs request the Court to remand the final result of this administrative review to the ITA for correction of certain clerical errors.

## IV. ADDITIONAL ARGUMENTS OF PLAINTIFFS ZENITH AND UNIONS.

(n) Zenith and Unions allege that pursuant to 19 U.S.C. § 1677a(d)(1)(C) the ITA was required to add to the U.S. price the amount of taxes which were collected on all sales of the merchandise in the home market and which were rebated or not collected by reason of exportation to the United States, and only to the extent that these taxes were passed-through to the Korean consumers, instead of deducting the full amount of these taxes from FMV.

(o) Zenith and Unions challenge the ITA's practice of applying the weighted average antidumping duty rates, which were established in these final results of the administrative review, to the entered invoice value of the future entries of the merchandise, rather than their statutory U.S. price, for duty deposit purposes.

(p) Zenith and Unions allege that in calculating Daewoo's costs of producing the merchandise, the ITA mistakenly omitted the amount of certain rebates which were made by Daewoo on some home market sales.

(r) Zenith and Unions allege that the ITA failed to account for costs of the additional nameplates, which were installed on Gold Star's exported merchandise, by either making an adjustment to FMV for physical differences in the merchandise under comparison, or including the value added by the additional nameplates in its calculations of the U.S. price.

## I. CALCULATIONS OF FMV

### (a). *Treatment of Bad Debt Expense in the Home Market.*

■ Plaintiff Samsung challenges the ITA's refusal to make a circumstance-of-sale adjustment to FMV for differences in bad debt expenses between the U.S. and home markets.

Samsung does not dispute that the bad debt expense in question resulted from sales which were made prior to this review period. At the same time, Samsung contends that bad debt expenses are similar to warranty expenses which are incurred with regard to prior sales and for which adjustments are usually granted by the ITA.

Samsung alleges that because the ITA allows the adjustments for warranty expenses, which are incurred during a period under review with regard to prior sales, bad debt expenses incurred with regard to prior sales, but realized during this review period, should also qualify for an adjustment as directly related selling expenses.

Defendant disputes Samsung's argument that warranty and bad debt expenses should be accorded similar treatment under the antidumping law. The ITA argues that according to the long-standing practice dating back to the administration of the law by the U.S. Department of Treasury, bad debt expenses qualify only as indirect selling expenses, unless they are directly attributable to the sales under review. In other words, the ITA contends that bad debt expenses must be incurred on the sales subject to the administrative review in question, and they must be written off or determined to be uncollectible during the period under review in order to qualify as directly related expenses which can be deducted from FMV.

At the same time, the ITA does not dispute that it usually allows adjustments for warranty expenses which are calculated on the basis of warranty expenses incurred with regard to prior sales. Commerce justifies the difference in treatment between

warranty expenses and bad debt expenses as follows:

> Warranty expenses are specifically subject to circumstance-of-sale adjustments under the regulations, as directly related expenses, even though the warranty expenses owing to the sales under review will not be incurred until after the review. 19 C.F.R. 353.15(b). Commerce uses warranty expenses incurred during the review as the best information available for those expenses that will arise with respect to the sales under review. See Adjustment Study at 39. Warranty expenses are, by their very nature, expenses directly related to specific sales. Bad debt losses, on the other hand, are not direct selling expenses related to particular sales unless and until they are written off under the home country's statutory procedure. Until that time, the bad debt is merely an account receivable, and not an *expense* incurred with respect to a particular sale, since it could still be collected. Warranty expenses, on the other hand, are always direct. Thus, use of best information is justified. However, since a bad debt loss remains an *indirect* expense until written off, it cannot be used as a surrogate for a possible future *direct* expense.[3]

The Court does not discern from this reasoning by the ITA that a meaningful distinction exists between warranty expenses, which are supposedly "always direct," whether or not they are actually incurred with regard to the sales under review, and bad debt expenses, which are determined to be either "direct" or "indirect" depending on whether they are actually incurred with regard to the specific sales under review.

The Court does not find any support for the ITA's practice of using "warranty expenses incurred during the review with regard to previous sales as the best information available for those expenses that will arise with respect to the sales under review, while refusing to apply a similar method with regard to Samsung's bad debt expenses.

The ITA argues that until the bad debt loss is actually incurred, or written off, it is not a direct selling expense, but is "merely an account receivable ... since it could still be collected." *Id.* This reasoning implies that an adjustment for bad debt can almost never be granted, because by the time Samsung attempts to collect the debt, the period of review with regard to which the debt has been incurred, and could be considered a direct selling expense, would ordinarily have expired.

The Court does not discern any logic in the ITA's reasoning that comparison of bad debt expenses to warranty expenses is not appropriate. The actual amount of both expenses are not usually known at the time of sales, because these types of expenses by their very nature are incurred sometime in the future when, and if, the merchandise malfunctions, or when a purchaser defaults. In other words, calculation of both types of expenses is always contingent on future events. Commerce's Adjustment Study explains:

> For some expenses, however, we may use costs incurred during a particular period as the best information available for expenses associated with the sales under consideration. For example, we have used warranty costs incurred during the period of investigation or historical warranty data incurred over a longer period as best information for warranty costs associated with sales made during the period of investigation, since the latter ordinarily would not be known until long after the period of investigation.[4]

Thus, the ITA estimates the amount of warranty expenses on the basis of the companies' current experience with regard to warranty expenses incurred on the past sales of the merchandise. This "best information" estimate is then deducted from FMV so that the built-in home market price

**3.** Defendant's Brief in Opposition to the Motions of Daewoo, Samsung and Gold Star for Judgment upon the Agency Record (the "ITA Brief I") at 40–41 (emphasis in original).

**4.** "U.S. Department of Commerce Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change." U.S. Department of Commerce 1984.

surcharge for the potential warranty obligations would not distort the comparison of FMV to the U.S. prices, when no warranty obligations are undertaken on U.S. sales of the merchandise. The ITA does not provide any explanation as to why an adjustment for a similar built-in surcharge to account for bad debt losses is not appropriate. Commerce does not dispute that bad debt losses do qualify as selling expenses, arguing only that bad debt losses, as opposed to warranty expenses, are not *direct* selling expenses, unless they are incurred with regard to the sales under review. Absent any reasonable indication as to why the estimation of bad debt expenses based on past experience is any less reliable than the use of past experience for warranty expenses, this distinction between them is not proper.

The Court finds that the ITA administrative practice disregarding the selling expenses for bad debt losses, while granting adjustments for warranty expenses which are not incurred with regard to the sales under review, is arbitrary and is likely to result in distorted calculations of FMV.

Finally, the Court cannot accept the ITA's distinction in treatment between warranty and bad debt expenses, merely because warranty expenses are specifically listed in the regulations, 19 C.F.R. § 353.15(b),[5] while bad debt expenses are not specifically listed.

It is clear from the specific language of the regulations, that warranty expenses are listed merely as an example of allowable circumstances-of-sales adjustments and that the variety of such adjustments is in no way limited to the expenses specifically listed in the regulations.

The Court remands this issue to the ITA for reconsideration of a circumstance-of-sale adjustment for Samsung's bad debt losses in accordance with this opinion.

### (b) *Exclusion of Sales at-less-than Cost from FMV*

■ Plaintiff Daewoo alleges that the ITA excluded certain home market sales from consideration in determining FMV in violation of Section 773(b) of the Act, 19 U.S.C. § 1677b(b).[6] The parties do not dispute that one model of CTRs was sold in the home market below its costs of production in substantial quantities and over an extended period of time. Daewoo alleges, however, that Commerce was not authorized to exclude those sales from calculation of FMV, unless the second condition of Section 773(b) of the Act was also established to show that those sales were "not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade." 19 U.S.C. § 1677b(b)(2).

Daewoo asserts that the ITA failed to meet the second condition precedent which would allow for exclusion of these sales from the calculation of FMV. In particular, plaintiff asserts that the ITA failed to consider the long term nature of the start-up costs incurred by Daewoo when it entered the television market in March of

---

**5.** 19 C.F.R. § 315(b) provides:
(b) *Examples.* Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

**6.** 19 U.S.C. § 1677b(b) provides:
(b) **Sales at less than cost of production.—** Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or. as appropriate. to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales made at less than cost of production—
(1) have been made over an extended period of time and in substantial quantities, and
(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade,
such sales shall be disregarded in the determination of foreign market value ...

1983 by acquiring a Korean CTR producer, Taihan Electric Wire Co., Ltd.

Daewoo alleges that the "unusual, one-time advertising and customer relations expenses that were necessary in order to create a public awareness that Daewoo, a company that had never sold any consumer electric or electronic products, was now a substantial television supplier in Korea," qualify as start-up costs which would not recur in such a substantial amount in the normal course of trade, and which would be recovered within a reasonable period of time.[7]

The Court does not find within the statutory provision in question any specific criteria for ascertaining what business activities should be considered to be conducted in "the normal course of trade", nor does the statute specify what is "a reasonable period of time" within which the costs of production could be recovered in the normal course of trade. These determinations, therefore, fall within the discretion and expertise of the administering agency on a case-by-case basis.

■ The Court finds that the ITA violated its discretion by refusing to consider whether the post-acquisition management, marketing, and advertising expenses of Daewoo were in fact start-up costs in this particular case. Instead, Commerce concluded as a matter of administrative practice, that start-up costs are limited to investments in long-term capital assets, such as manufacturing facilities and machinery, or expenses associated with the development of a new product. Commerce refused to consider Daewoo's acquisition-related expenses merely because they were associated with an acquisition of production facilities which were a "going concern." In particular, Commerce asserts that "the costs Daewoo incurred for marketing and advertising were not the type of 'start-up' costs incurred by a company beginning initial production, such as capital investment

and research and development, but rather, costs incurred to increase the market share of a *continuing concern.* Expensive though this marketing campaign might have been, it is not a 'start-up' cost because Taihan was a continuing concern."[8]

Thus, Commerce acknowledges the extraordinary amount of these expenses, which indicates that they were not made in the normal course of trade. At the same time, Commerce ignored the unusual acquisition-related nature and the size of this expense focusing instead on the classification of the type of the expense: "In any event, such marketing and advertising activities are undeniably an ordinary part of the business of selling products such as television receivers."[9]

The legislative history of this provision provides the following guidance for making such determinations on a case-by-case basis.

These standards would not require the disregarding of below-cost sales in every instance, for *under normal business practice in both foreign countries and the United States, it is frequently necessary* to sell obsolete or end-of-year merchandise at less than cost. Similarly, certain products, such as commercial aircraft, typically require large research and development costs which could not reasonably be recovered in the first year or two of sales.[10]

The absence of any restrictions in § 773(b)(2) with regard to the type and length of justifiable sales at less than cost as well as the nonexclusive nature of the legitimate examples of such practices in the legislative history indicate that the "normal" or justifiable business practices of sales below costs are not limited to sales of obsolete merchandise or merchandise which require extensive initial investments for research and development.

The statutory language and the legislative history indicate that these specifically

---

7. Reply Brief on Behalf of Daewoo at 10.

8. The ITA Brief I at 50–51 (emphasis in original).

9. *Id.,* at 51–52.

10. S.Rep. No. 1298, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, at 7186, 7310 (emphasis added).

described situations were only intended to serve as examples of justifiable sales below current costs of producing the merchandise. Rather, the open language of § 773(b)(2) indicates the intention of Congress that other circumstances might exist which could constitute a "normal business practice" justifying temporary sales below costs of production which should not be excluded from calculations of FMV. The commercial aircraft example in the legislative history also indicates that Congress intended to achieve flexibility with regard to the period over which these necessary additional expenses should be expected to be recovered.

Commerce's reliance on this legislative history to limit "the normal business practice" which could justify periodic below costs sales to start-up capital investments involving acquisition of new machinery or production facilities or development of a new product as a matter of administrative practice is not in accordance with the law.

The Court finds that Commerce has arbitrarily refused to consider whether the unusually high marketing and advertising costs incurred by Daewoo after acquiring a production facility of another company were a normal and legitimate business practice under the circumstances. Instead, Commerce automatically treated these expenses as ordinary business expenses which should be recovered on a current basis.

■ Once Commerce refused to consider whether Daewoo's expenses were in fact a legitimate business practice which justified temporary below costs sales, the automatic use of the six-months period as "a reasonable period" within which these expenses should be recovered also fails to comply with the intent of the statute.

In *Toho Titanium Co., Ltd. v. U.S.*, 657 F.Supp. 1280 (CIT 1987), the court remanded the final determination of the ITA that below cost prices of titanium sponge in Japan would not permit recovery of all costs within a reasonable period of time, because it was not supported by substantial evidence on the record. While rejecting the argument that the entire business cycle of the industry in question should be considered "a reasonable period of time", *Toho* held that some projected period of time must be considered:

> Central to a proper determination by Commerce is some discussion on the record as to why the prices charged on sales by Toho will not allow recovery of its costs in a reasonable period of time. For example, if there is no change in Toho's cost of production then future sales at the prices charged during the investigatory period below cost logically could never recover all costs. If the cost of production declines in the future below the investigatory prices, however, then such prices may allow recoupment of all costs at some future date ...
>
> \* \* \* \* \* \*
>
> The Court finds that Commerce must evaluate the prices charged by Toho during the investigatory period in relation to *projected cost of production* ... in determining whether such prices will allow recovery of all costs in a reasonable period of time in the normal course of trade ...

(*Id.*, at page 1286).

The statute clearly recognizes that the temporary nature of some unusually high costs which are incurred during the period under investigation requires prospective amortization of such costs over a reasonable period of time beyond the immediate review period.

■ This Court agrees that the issue as to whether losses from such below cost sales could be recovered "within a reasonable period of time" concerns a period subsequent to the investigation. The interpretation that the period already under review may constitute such "reasonable period" would lead to an absurdity, because the findings that the sales are made at less than their costs of production during the review period and a determination whether all costs could possibly be recovered during the *same* period are mutually exclusive.

The statute requires Commerce to determine a prospective period of time, which reasonably corresponds to the long-term

nature of the business expense in question, over which period this expense should be amortized in order to determine whether all costs would be recovered at the observed sales prices.

Finally, the requirement to project sales "in the normal course of trade" over "a reasonable period of time" in order to determine whether all costs could be recovered should not be confused with the decision in *Toho* "that Commerce may rely on data covering only a six-month period in making the determination" (*Id.*, at 1286). The ITA is clearly allowed to base its determination on the information collected during the current review period and without a need to monitor the actual future costs or prices for the purposes of this determination.

■ Daewoo also alleges that the ITA erred in conducting its less-than costs analysis on a model-by-model basis and that the average cost of producing all models during the review period should instead be used for comparison to Daewoo's home prices. Plaintiff fails to bring any legal support for this allegation, and, therefore, the Court does not see any reason to disturb the ITA's procedure of comparing both prices and costs of the most similar merchandise on a model-by-model basis.

The Court remands this issue to the ITA for reconsideration in accordance with this opinion. Commerce is directed to evaluate the specific circumstances of the case in making its determination as to whether post-acquisition expenses of Daewoo could be recovered over a reasonable period of time at the observed prices.

(c) *Difference-in-merchandise Adjustment for Import Duties on Parts of CTRs.*

■ In comparing foreign market value to the U.S. price of the subject merchandise, which contained various imported parts, the ITA made adjustments for physical difference between domestically sold and exported merchandise on a duty-excluded basis. Pursuant to the Korean duty drawback law, exportation of the merchan-

dise to the United States entitled plaintiffs to a refund of import duties which were incurred upon importation of those parts into Korea.

The ITA considered these duty refunds in determining the FMV of the merchandise and attempted to deduct from FMV the amounts of import duties which were incurred, but not refunded, on imported parts of domestically sold merchandise. Since it proved impossible to trace the amounts of import duties paid by various Korean suppliers of the imported parts, the ITA estimated the amount of such import duties at 30 percent of the actual costs of the component parts.

Plaintiffs allege that the ITA's calculation of the adjustment for physical differences on a duty-excluded basis is inconsistent with the prevailing administrative practice and is grossly distorted. In addition, plaintiffs assert that the estimation of import duties at 30 percent of the parts' costs is not supported by the evidence on the record.

The ITA admits that it committed an error by calculating an adjustment for physical differences in merchandise on a duty-excluded basis and requests a remand to correct this conceded error.

Zenith and Unions allege, however, that the ITA determination of this adjustment should be affirmed, because neither the statute, nor the regulations require this adjustment to be made on either duty-excluded, or duty-included basis.

The Court cannot find that the ITA has properly exercised its discretion when the agency itself concedes its error with regard to this issue admitting that this decision represents a departure from administrative practice:

> This attempt to exclude import duties from the cost of materials in calculating adjustments for physical differences represents a significant departure from the prevailing Commerce practice, which treats duty incurred on imported raw materials and passed on to manufactur-

ers as part of material costs.[11]

The Court is remanding this determination to the agency for the reconsideration of this adjustment on a duty-included basis.

#### (d) *Selection of Interest Rates in Calculation of FMV.*

■ Commerce concedes that in calculating credit expenses incurred on sales in the home market between the time of sale and the time of payment with regard to Daewoo, the ITA improperly used a 10 percent interest rate which was based on "best information available", rather than the actual company-specific and verified information which was duly provided by Daewoo. Commerce admits that its failure to use Daewoo's actual credit expenses is not supported by substantial evidence on the record and requests a remand to recalculate this adjustment.

Plaintiff Samsung alleges that it had also provided information with regard to its actual interest expenses during this review period and that Commerce was required to use that information which was verified by the ITA.

The Court finds that the use of 10 percent interest rates with regard to both Daewoo and Samsung is not supported by substantial evidence on the record. The record indicates that the ITA did not conduct this administrative review in accordance with the established procedure. While denying plaintiffs' request to conduct the expedited review under Section 736(c) of the Act, the ITA began its regular administrative review under Section 751(a) of the Act soon after publication of an antidumping order, instead of awaiting for the first anniversary of the order. At the same time, Commerce proceeded to use information provided by plaintiffs in support of their expedited review requests under Section 736(c), instead of following the regular procedure of providing a questionnaire containing the appropriate instructions needed to compile the required information.

Samsung alleges that it was not informed in a timely manner of the specific requirements with regard to the form and methods of compiling the information substantiating the credit expenses. The ITA refused to utilize Samsung's calculation of its short-term credit experience, which was verified, because it included certain borrowings in the form of debentures, export, and import loans, which should not be included in such calculations. Samsung alleges that the ITA should have recalculated the interest expenses by excluding those loans, or alternatively, that the ITA should have considered the corrected calculations of the interest expense which were subsequently provided by Samsung along with substantiating documents.

It has been established that Section 776(b) of the Act, 19 U.S.C. 1677e(b), requires Commerce to use "best information otherwise available", which can be detrimental to plaintiffs' interests, only when "a party or any other person refuses or is unable to produce information *requested* in a timely manner and in the form required, or otherwise significantly impedes an investigation." *Id.*, (emphasis added).

In *Atlantic Sugar, Ltd. v. U.S.*, 744 F.2d 1556, 1560 (CAFC 1984), the court defined the punitive nature of the best information rule as follows:

> In short, one may view the best information rule, as the ITC urges, as an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest. One may as well view the rule, in light of the legislative history cited, as a club over the ITC's head, which Congress has brandished to force that agency to arrive at *some* determination within the time allotted.

In the case at hand, the ITA did not resort to the best information rule in order to insure compliance with the deadlines "allotted" by Congress, but attempted to complete this premature review within self-imposed deadlines. Nor did Samsung fail to cooperate in this review or otherwise impede the proceeding.

---

**11.** The ITA Brief I at 14.

Moreover, the record indicates that Samsung's non-compliance consisted of providing too much information, rather than failing to provide adequate information, which the ITA could analyze and reprocess in view of the ITA's own failure to provide instructions as to the methods of compiling the information.

Samsung was not given an appropriate opportunity to reshape its original Section 736(c) submission with regard to its credit expenses, so that it could meet previously unspecified requirements of the ITA. Before the ITA may find any non-compliance on the part of the parties to the proceeding, there must be a clear and adequate communication requesting the information, which is absent in this case.

The Court remands the determination to use best information otherwise available in calculations of both Daewoo and Samsung's credit expenses in the home market to the ITA for reconsideration, because it is not supported by substantial evidence on the record and is not in accordance with the law.

(e) *Deductions for Volume Rebates and Warranty Expenses in FMV Calculation.*

■ Commerce also applied the best information rule to calculate the adjustments for volume rebates and warranty expenses which Samsung incurred in the home market. Samsung alleges that these expenses were fully verified by the ITA during its first verification in July, 1984, and that Commerce never indicated that this information was either inadequate or not properly substantiated. Samsung alleges that the ITA did request that a new computer tape be submitted after the verification, "[b]ecause the verified information contained certain revisions from Samsung's original May 1984 submission, ... to save the Department [of Commerce] the time of keypunching the verified data into the computer".[12] Samsung asserts that the ITA refused to rely on this verified information stating that it was submitted too late and not in the right format, and that Commerce

proceeded to use "best information otherwise available" under Section 776(b) of the Act to plaintiff's detriment.

The ITA defends its decision to use "best information available" by reiterating the conclusion of the final results under review, which states:

Samsung supplied the Department with new computer tape over three weeks after the November 1, 1984 deadline. The tape was not formatted properly and the Department could not use it. Samsung was aware of the formatting requirements and had submitted a previous tape that was usable. Even if the tape in question were usable, the Department has serious doubts about using it at such a late date. The tape was submitted after the verification in November. Samsung claimed that it reflected the verification changes. If we had used that tape, we would not have had any opportunity to corroborate that claim. Manual correction by use of a new average number based on the verification would distort the customer-specific nature of the claim.

49 Fed.Reg. 50420, 50431.

Similar to the issue of home market credit expenses, the Court cannot uphold the ITA's use of "best information available" in calculating the rebate and warranty adjustments, because Commerce failed to avail plaintiff of an opportunity to provide timely and complete responses, because Commerce did not request plaintiff to supplement its response with regard to these expenses until the verification, and because Samsung complied with the ITA's request to provide this information during verification. Subsequent submission of verified information on a new computer tape, which was allegedly not formatted properly, does not relieve Commerce's responsibility to utilize information which passed its verification scrutiny.

In the process of expediting this regular administrative review, presumably to compensate plaintiffs for the refusal to conduct the short Section 736(c) review, Commerce

---

**12.** Samsung's Brief at 47–48.

has curtailed certain normal procedural safeguards of this administrative proceeding. The Court remands this issue to the agency for reconsideration in accordance with this opinion and to provide plaintiffs with a meaningful opportunity to participate in the review.

(f) *Calculation of ESP Off-set Cap Limiting an Adjustment to FMV.*

■■■ The ITA also concedes that it erred in failing to include the amount of selling commissions in the U.S. market in calculating the so-called ESP off-set cap.

In addition to the circumstance-of-sales adjustments for differences in direct selling expenses between the U.S. and foreign market, Section 353.15(c) of the Regulations provides for an adjustment to FMV for other selling expenses, which are incurred in the home market, but only to the extent of the ESP off-set cap:

(c) *Special rule.* Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, reasonable allowances for other selling expenses generally will be made in cases where a reasonable allowance is made for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, the amount of such allowance being limited to the actual other selling expense incurred in the one market, or the total amount of the commission allowed in such other market, whichever is less. In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market.

19 C.F.R. § 353.15(c). The amount of U.S. selling expenses which limit the size of adjustments for indirect selling expenses to FMV in exporter's sales price situations is called ESP off-set cap. The ITA's failure to include the amount of selling commis-

sions incurred by Daewoo in the U.S. market in calculations of the ESP off-set cap, therefore, deprived plaintiff of a corresponding reduction in FMV and thus improperly increased the resultant calculations of dumping margins.

The Court remands the final results to the ITA for recalculation of the ESP offset cap in accordance with 19 C.F.R. § 353.15(c) as requested by the agency.

## II. CALCULATION OF UNITED STATES PRICE.

(g) *Treatment of Account Receivables From Parent Companies as Indirect Selling Expenses.*

■■■ Samsung alleges that Commerce erred in treating the amount of the accounts receivable from the parent company, which appeared on its U.S. subsidiary's balance sheet as indirect selling expense, and deducting this amount in the calculations of ESP under 19 U.S.C. § 1677a(e)(2).

Commerce concedes that it erred in making these adjustments without establishing that these amounts in fact represent indirect selling expenses, which were incurred by the parent companies on behalf of their subsidiaries in the United States. The ITA concedes that "the mere *possibility* of an incomplete response—raised at the end of the case after all the verifications were complete—was not a sufficient reason to abandon the verified information".[13]

Zenith and Unions insist, however, that the adjustments were proper and claim, in addition, that similar adjustments should be made for Gold Star and Daewoo, because their financial documents also contain receivables "apparently representing receipts in advance of expense incurred."[14]

Zenith urges the Court to disregard Commerce's concession of the error, stating that it is not binding on the Court. Zenith relies on *Ashland Oil v. FTC,* 548 F.2d 977, 981–82 (D.C.Cir.1976):

Even if government counsel had attempted to disavow the basis on which

---

13. The ITA Brief I at 32 (emphasis in original).

14. Motion of Zenith Electronics Corporation for Judgment upon the Administrative Record ("Brief in Chief of Zenith") at 26.

the FTC acted—and it is clear from the foregoing that he did not—his statements could not bind the court to ignore the rationale on which the FTC's decision was actually based. No principle of administrative law is more firmly established than that a court must review discretionary actions in terms of the rationale on which the agency acted, rather than "accept appellate counsel's *post hoc* rationalizations," *Burlington Truck Lines v. United States*, 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

The Court finds that the issue before this Court is not whether the Court is bound by the agency's concession of its error, but whether the rationale upon which the ITA made the adjustments in question was reasonable, supported by the evidence on the record, and was otherwise in accordance with the applicable law.

The above quotation from *Ashland* indicates clearly that the government counsel in that case did not "disavow the basis" for the agency's action. *Id.* In the case at bar, however, the ITA does concede that it did not have any supportable rationale for disregarding the actual and verified information and for making the adjustment for the account receivables.

The Court is remanding the final result of this administrative review to the ITA for correction of the erroneous deductions from ESP as requested by the ITA.

(h) *Treatment of Legal Fees as Selling Expenses.*

■ Samsung alleges that the ITA erred in deducting from the U.S. price the legal expenses, which were incurred by Samsung during this review period in relation to the preceding antidumping investigation, in violation of 19 U.S.C. § 1677a(e)(2).

**15.** 19 U.S.C. 1677a(e)(2) in relevant part provides:
(e) **Additional adjustments for exporter's sales price.—**
For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—

Zenith and Unions argue to the contrary that the ITA properly made this adjustment and that Commerce erred in failing to make similar adjustments for legal expenses which were also incurred by Daewoo and Gold Star.

The ITA concedes that legal fees do not qualify as selling expenses deductible from ESP and that the administrative record of this review fails to articulate any rationale for treating the legal fees as deductible selling expenses. Furthermore, Commerce admits that no such rationale exists and that Commerce's established practice is not to consider legal fees as either directly or indirectly related selling expenses.

The Court is satisfied with Commerce's explanation that legal fees do not qualify as selling expenses, and that it would also be against public policy to make an adjustment for legal fees in calculations of dumping margins. Such practice would create artificial dumping margins and might encourage frivolous claims in order to incur legal fees which would result in increased margins.

The Court remands the final results of the administrative review to Commerce for correction of this erroneous deduction with regard to the legal expenses incurred by Samsung.

(i) *Export-related Selling Expenses Incurred Outside of the United States.*

■ Plaintiffs claim that Commerce violated 19 U.S.C. § 1677a(e)(2) [15] in deducting from ESP certain selling expenses which were not incurred within the territory of the United States. Plaintiffs do not dispute that these selling expenses relate to their export sales in the United States, but allege that only those expenses which are incurred within the United States are deductible from the U.S. price.

\* \* \* \* \* \*
(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise ...

Plaintiffs also allege that these expenses must be reflected on the accounting books and records of exporters, rather than those of their parent companies in Korea, in order to meet the requirement of 19 U.S.C. § 1677a(e)(2) that they must be incurred "by, or for the account of the exporter in the United States".

Defendant concedes that the ITA did limit the adjustments to those expenses which were incurred within the United States in the past. Defendant asserts, however, that the ITA has revised its administrative practice and is consistently following its current practice of making appropriate adjustments for all expenses incurred in relation to the U.S. exports.

 The Court does not find that the site or location at which the selling expenses are incurred, is decisive for the purposes of making these adjustments under 19 U.S.C. § 1677a(e)(2).

In *Silver Reed America, Inc., et. al. v. United States*, 683 F.Supp. 1393 (CIT 1988), plaintiff Silver similarly contended that the inventory carrying costs which were accrued during the time the merchandise was being transported to the United States should not be deducted from the U.S. price, because these expenses were not incurred in the United States. The court in *Silver* upheld the defendants' position, however, that "the phrase 'in the United States' does not limit the word 'incurred,' and [that] in any event § 1677a(e)(2) was not intended to limit the deductibility of selling expenses, incurred by or on behalf of the exporter, that are related to United States sales." *Id.* at 1396. We adhere to the conclusions reached by the court in *Silver Reed* for the following reasons.

The U.S. price of the merchandise can be based on either "the purchase price, or the exporter's sales price [ESP] of the merchandise, whichever is appropriate." 19 U.S.C. § 1677a(a).

The statutory distinction between the purchase price, the price at which the merchandise is purchased by a U.S. purchaser, and the exporter's sales price, the price at which the merchandise is sold to a U.S. purchaser, would not be very meaningful, but for the emphasis on the additional selling activities conducted by foreign exporters in ESP situations in order to sell their merchandise in the United States.

Consequently, 19 U.S.C. § 1677a(e) provides for adjustments which have an equalizing effect of removing these additional selling expenses from the U.S. price. These adjustments have the effect of converting ESP into a regular purchase price so that the U.S. price in both situations could be measured "at the specific, 'common' point in the chain of commerce" when the merchandise is leaving the "factory gates." *Smith–Corona Group, SCM Corp. v. United States*, 713 F.2d 1568, 1572 (CAFC, 1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

This statutory construction reflects an economic presumption that exporter's sales price must contain a built-in surcharge to reflect these additional selling expenses which must be stripped from the ESP, in order to make a fair price comparison. If the foreign exporters do not adequately raise their U.S. prices to cover these additional selling expenses, the adjusted ESP would accurately reflect this unfair practice.

This provision reflects a clear Congressional mandate to account for the additional selling activities by the foreign exporters in selling the merchandise in the United States. This requirement does not change merely because these additional export-related selling expenses happen to be incurred and financed by the exporters' parent companies in the country of exportation. Congress specifically provided that these expenses could be made either by the exporters themselves, or by other unspecified entities "for the account of the exporter in the United States". 19 U.S.C. § 1677a(e)(2). When some export-related activities and their costs are absorbed by the exporters' parent companies, it is fair to conclude that they were incurred for the account of the exporter in the United States.

The legislative history of this provision, as well as its intended purpose, indicate that the only geographic requirement with regard to these expenses is their relation to sales in the United States. The Senate Report accompanying the enactment of the provision's predecessor in the 1921 Antidumping Act, which is not modified with respect to this issue, stated:

> In substance, the term "exporter's sale price" is defined in such manner as to make the price the net amount returned to the foreign exporter.

S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921).

Since the definition of the foreign exporter includes both the foreign manufacturer and its selling subsidiary in the United States, this statement indicates that all U.S. export related expenses were intended to be deducted in order to determine the net amount of the U.S. price.

Similarly, the testimony during the debate over this provision states:

> [An] appraiser [currently, the ITA] can disregard the apparent sales price and take the sales price of the importer in the United States, and after subtracting from that price the expenses *incurred in placing the merchandise in the market of the United States,* will reach the real sales price at which the merchandise entered into competition with comparable merchandise *in the United States.*

59 Cong.Rec. H328 (daily ed. Dec. 9, 1919) (Remarks of Rep. Fordney) (emphasis added). This statement indicates clearly that the selling expenses do not have to be incurred in the United States, but have to be made *"in placing* the merchandise for sale in the United States." *Id.* (emphasis added).

▆▆▆ The alternative allegation of plaintiffs that in order to be incurred by or for the account of the exporter in the United States, these expenses must be reflected on the U.S. exporters' accounting books and records is impermissibly narrow and clearly erroneous. It substitutes the technical meaning of the term "for the account" as used in the accounting profession for the common meaning of the term. The phrase "by, or for the account of the exporter" commonly means that the expense may be incurred on behalf of the exporter. The context of the provision in question does not indicate that the strict accounting meaning of the term "for the account", so that these expenses should be reflected on the exporters' records, was intended by Congress.

The Court is satisfied that the current interpretation of this provision by the ITA is reasonable and is in compliance with the Congressional intent and purpose of the law. The Court affirms the final results by the ITA in making an adjustment for selling expenses which are incurred by plaintiffs in Korea in connection with their sales of the merchandise in the United States.

*(j) Deduction Of Pre–Sale Credit Expenses From ESP*

▆▆▆ Plaintiffs Daewoo, Gold Star and Samsung allege that the ITA erred in adjusting the exporter's sales price for imputed credit expenses which are incurred between the time the merchandise is exported from Korea and the time it is sold by their U.S. subsidiaries to unrelated purchasers in the United States.

Plaintiffs allege that this practice is unfair because it is inconsistent with the ITA's practice of disallowing a parallel adjustment to FMV for pre-sale credit expenses in the home market, and that only the actual, rather than imputed selling expenses may be deducted from ESP. According to plaintiffs, this disparity in treatment between pre-sale credit expenses in the home market and those in the United States represent an arbitrary abuse of the agency's discretion.

A separate argument with regard to the measurement of pre-sale credit expenses for the purposes of ESP calculations is raised by Zenith and Unions as plaintiffs in a consolidated action. Zenith and Unions defend Commerce' practice of making the adjustment for inventory carrying costs to ESP.

With regard to the measurement of the inventory carrying costs, Zenith and Un-

ions allege, however, that Commerce improperly applied the home market interest rate, rather than the higher United States interest rate, to a portion of the inventory carrying period when the merchandise entered the United States and was awaiting its sales to unrelated U.S. purchasers.

After examining whether this difference in treatment of the credit expenses in calculating the U.S. price and FMV is warranted by the antidumping law, the Court does not find any support for the allegations of plaintiffs.

The actual issue before the Court is whether 19 U.S.C. § 1677a(e)(2) requires an adjustment to ESP for these pre-sale credit expenses, and whether these are *additional* selling expenses which the exporters would not have to incur, but for the exportations of the merchandise to the United States for sale by their U.S. subsidiaries.

The legislative history discussed in the previous section explains the obvious rationale behind the deductibility of the additional selling expenses which are incurred by exporters in ESP situations. In purchase price transactions, when the first unrelated U.S. purchaser buys the merchandise from the exporters in their home country, the exporters do not have to finance the merchandise while it is en route to the United States and while it is held in the warehouses of their U.S. subsidiaries. In ESP situations, however, exporters are bound to incur these additional inventory carrying costs.

The Court also finds that these additional expenses are assumed to be actually incurred by financing and maintaining the merchandise, even though no specific entries with regard to these carrying cost may be found on the exporters' books and records. The practice of imputing these expenses by the ITA is a process of measuring these actual expenses, rather creating them artificially or arbitrarily.

 The Court is not convinced by the plaintiffs' argument that the ITA's failure to make a similar deduction for pre-sale credit expenses from FMV results in unfair comparison. Section 773 of the Act controls calculations of FMV and provides a

separate method of accounting for different selling expenses which are incurred with regard to the merchandise sold in the home market. 19 U.S.C. § 1677b. It would be inappropriate to invalidate a legitimate adjustment to ESP merely because no similar adjustment is generally made in calculations of FMV.

The Court finds neither statutory, nor equitable grounds in this case to require the exact same treatment of pre-sale credit expenses in the calculations of both exporter's sales price and foreign market value, which are completely different in nature.

In the Final Results of this administrative review, the ITA properly explained:

> We disagree that we are inconsistent in not adjusting for interest expenses incurred during the pre-sale inventory period in the home market while reducing United States price by the interest costs incurred from date of shipment to date of sale. From both United States price and foreign market value we deduct the cost for the period from date of shipment from warehouse in the home market to date of payment by the unrelated customer.

49 Fed.Reg. at 50427.

The Court finds that the "pre-sale" period in ESP sales and sales in the home market cannot be treated equally. In ESP situations, the statute does not allow for a determination of the U.S. price based on transaction prices between related parties, the foreign manufacturers and the U.S. selling subsidiaries. The sale to the first unrelated U.S. purchaser is treated as the actual sale of the merchandise. At the same time, the pre-sale period in ESP situations in fact includes a sale between the related parties with additional shipping, financing and selling costs, which are not part of pre-sale expenses in the home market. The Court finds that Commerce is required to treat these ESP pre-sale expenses differently in order to make a fair comparison. *See, Smith–Corona, supra.*

 Zenith alleges that in the subsequent administrative review, which is not subject to this action, Commerce has divid-

ed the pre-sale inventory period into domestic and U.S. portions and applied domestic and U.S. interest rates respectively. Consequently, Zenith alleges that the ITA erred in failing to apply the same methodology during the administrative review in question.

The Court will not address this allegation of Zenith, because it extends beyond the scope of this judicial review. The standard of judicial review under 19 U.S.C. § 1675 is limited to the administrative record of the final results subject to this action. The argument of Zenith is based on the events of the subsequent review period which is not now before this Court and with regard to which no administrative record is available for review.

The Court affirms the final results with regard to the additional adjustments to ESP for imputed inventory carrying costs as reasonable and in accordance with the law.

## III. PROCEDURAL CLAIMS.

### (k) *Section 737(a) Assessment Cap.*

■ Plaintiffs contend that Section 737(a) of the Act imposes a limitation on the amount of duties to be assessed as a result of this administrative review and that the duty assessed on entries which were made prior to the final determination of the ITC may not exceed the rates established in the preliminary determination of the initial less-than-fair value investigation.[16] In particular, Daewoo asserts that Commerce has violated both Sections 737(a) and 735 of the Act when it raised the preliminary estimated duty deposits rates immediately after its final determination in the initial LTFV investigation. Daewoo ar-

gues that Section 735 of the Act applicable to final determinations contains no authorization to modify the estimated duty deposit rates which are established in the ITA preliminary determination at the initial LTFV investigation. 19 U.S.C. § 1673b(d). Consequently, Daewoo contends that Commerce was required to continue to collect deposits at the same preliminary rates until the date of publication of the ITC final injury determination, and then to disregard any difference between those estimated preliminary rates and the actual assessment rates of this administrative review pursuant to Section 737(a) of the Act.

Plaintiffs cite one administrative decision, *Fireplace Mesh Panels from Taiwan,* 48 Fed.Reg. 31279 (1983), in which the ITA agreed with plaintiffs' interpretation of Section 737(a) of the Act. In response to a comment from an interested party in that administrative review, the ITA stated that it will limit the actual assessment rates for all entries made prior to the final determination of the ITC by the rates of estimated duties which were established in the initial less-than-fair value determination. Plaintiffs argue that by raising the rates of deposits immediately after its final LTFV determination, the ITA had indicated conclusively that it did not intend to limit the assessment of antidumping duties by the preliminary rates.

Defendant did not state its position with regard to this issue in its brief, but requested the Court to remand this issue to the ITA. The ITA did not concede its error, but requested a remand in order to address this issue and make a decision with regard to the proper interpretation of Section 737(a) of the Act.[17]

---

16. 19 U.S.C. § 1673f. **Treatment of difference between deposit of estimated antidumping duty and final assessed duty under antidumping duty order**

(a) **Deposit of estimated antidumping duty under § 1673b(d)(2) of this title.**—If the amount of a cash deposit collected as security for an estimated antidumping duty under § 1673b(d)(2) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under § 1673e of this title, then the difference for entries of merchandise entered, or withdrawn

from warehouse, for consumption before notice of the affirmative determination of the Commission under § 1673d(b) of this title is published shall be—

(1) disregarded, to the extent the cash deposit collected is lower than the duty under the order, or

(2) refunded to the extent the cash deposit is higher than the duty under the order.

17. The ITA requested a remand in order to make "whatever decision it may make", Deft Brief at 13.

Zenith and Unions, on the other hand, dispute plaintiffs' arguments on the merits and request this Court to rule on this issue without remanding it to the ITA.

Since the ITA requested a remand without stating its position with regard to its interpretation of Section 737(a), and without admitting an error, the Court ordered the ITA to provide "a memorandum of points and authorities explaining the legal position and the administrative practice of the ITA with regard to the application of 19 U.S.C. § 1673f".[18]

In the Memorandum, the ITA confirmed its interpretation of Section 737(a) of the Act as follows:

It has been our longstanding practice ... that two provisional measures assessment rate caps govern the liquidation of entries or withdrawals of merchandise between our preliminary affirmative determination and the ITC's final injury determination. As explained below, Section 737(a) of the Act permits us to adjust the provisional measures assessment rate cap based on our final affirmative LTFV determination.[19]

After a careful consideration of the intricate statutory scheme under review, the Court finds the agency's position with regard to the application of Section 737(a) of the Act is reasonable and is otherwise in accordance with the law.

The statutory scheme of the Act provides for a series of findings and determinations by the administering agency before the actual antidumping duty may be assessed on the entries of the subject merchandise. The actual assessment of antidumping duties does not occur until Commerce conducts its first administrative review of entries subject to an antidumping order.

The Court finds that Section 737(a) of the Act does not impose a limitation on the actual assessment rate by the rates established in the ITA preliminary determination, but requires only that the amount of duties assessed on entries made prior to the ITC final determination should be "disregarded, to the extent *the cash deposit collected* is lower than the duty". 19 U.S. C. 1673f(a)(1), (emphasis added).

Section 733(d)(2) of the Act contains an authorization to suspend liquidation of the subject entries and to collect deposits of estimated duty as part of the affirmative preliminary determination of the initial investigation. The reference to this authorization in Section 737(a) does not limit Commerce's authority to adjust those preliminary rates in their subsequent final determination in LTFV investigations.

Commerce properly refers to the legislative history of Section 733(d)(2) of the Act with regard to preliminary determinations which authorizes initial suspension of liquidation and collection of deposits, and states that these preliminary deposit rates could be adjusted "when more accurate information becomes available".[20] Secondly, Commerce provides a reasonable explanation of its position by reference to Section 735 of the Act.[21] This section authorizes the agency to suspend liquidation and collect cash deposits immediately after its final determination in cases where a preliminary determination of the ITA has been negative. The Court finds this provision very instructive in that it authorizes the ITA to order suspended liquidation of the subject merchandise immediately after its final de-

---

**18.** *See,* Order dated May 31, 1988. The ITA misunderstood the Court's Order, and instead of a legal memorandum, it filed a document entitled *Results of Remand of Final Results of Antidumping Duty Administrative Review, Color Television Receivers from Korea, Pursuant to Court Order in Daewoo Electronics Co., et al. v. United States,* dated June 28, 1988 (the "Memorandum"). Since the Court never remanded this issue to the ITA, this document will be treated as a legal memorandum.

**19.** *See* Memorandum at 4–5, footnote omitted.

**20.** *Id.,* at 7, citing S.Rep. No. 96–249, 96th Cong., 1st Sess. 65 (1979), U.S.Code Cong. & Admin. News 1979, 381.

**21.** 19 U.S.C. § 1673d(c)(1)(B) states:

(B) in cases where the preliminary determination by the administering authority under section 1673b(b) of this title was negative, the administering authority shall order *under paragraphs (1) and (2) of section 1673b(d)* of this title the suspension of liquidation and the posting of a cash deposit, bond or other security. (emphasis added).

termination by reference to Section 733(d) with regard to preliminary determinations. This reference to the authorization provision of Section 733(d) of the Act indicates that that provision granted Commerce a continuing authority to suspend liquidation and to collect estimated duty deposits.

This provision indicates that the ITA has the authority to collect updated deposits in the amount at which foreign market value of the merchandise exceeds its U.S. price and to make a corresponding change in the deposit rates when the ITA perfects its calculations as a result of its final determination.[22]

The Court does not agree, therefore, that Section 737(a) of the Act limits the actual assessment of antidumping duty to the preliminary rates of estimated duty. If the merchandise was entered prior to the final determination, the rates established in the ITA preliminary determination would serve as an assessment cap. Conversely, if the merchandise is entered after the preliminary rate was raised as a result of the final determination, that higher rate would serve as the limit of the actually assessed duties for all those entries which have been made prior to the final injury determination of the ITC pursuant to Section 737(a) of the Act.

Plaintiffs' reliance on *Antidumping Code on Implementation of Article VI of GATT* (the *"Antidumping Code"*) is confused. The Court does not find any conflict between this international agreement and its implementing provision in Section 737(a) as interpreted by the ITA.

The relevant provision of Article 11 of the *Antidumping Code* states that

> If the antidumping duty fixed in the final decision is higher than the provisionally paid duty, the difference shall not be collected.

Plaintiffs' interpretation of this provision equates the term "provisionally paid duty"

with preliminary rates of duty to the exclusion of the rates established in the final determinations of the ITA. Plaintiffs ignore the provisional nature of duties which are imposed as a result of the final determination and which also serve merely as estimated duty until the actual assessment rates are established as a result of the administrative review. Pursuant to the definition of "provisionally paid duty" of the *Antidumping Code,* both the ITA preliminary and final rates of duty in the initial LTFV investigation represent provisionally paid duty.[23]

Finally, plaintiffs' interpretation of this provision would render meaningless the meticulous calculations required under the Act in both the final determinations of LTFV investigations and final results of the first administrative review. The Court does not find that Congress intended this absurd result. The Court affirms Commerce's interpretation and application of Section 737(a) of the Act.

### (*l*) *The Disclosure Requirement.*

Daewoo and Gold Star allege that the ITA improperly refused to disclose the computer programs and printouts which contained calculations of the final results of this administrative review.

 The ITA and defendant-intervenors contend that this issue is moot, because plaintiff, as a result of bringing this action, have obtained access to the documents in question as part of the administrative record filed with this Court under the judicial protective order.

Plaintiffs contend that the issue as to whether the ITA is required to release the computerized information at the end of the administrative proceeding is capable of recurrence, and, therefore, it should not evade judicial review on the ground of mootness.

---

**22.** The ITA indicates that it would ordinarily do so even when the amount of security has to be adjusted downward. *See* Memorandum at 8, footnote 5.

**23.** Article 10 of the *Antidumping Code* provides that

> Provisional measures may take the form of a provisional duty or, preferably, a security by cash deposit or bond—equal to the amount of the anti-dumping duty provisionally estimated, being not greater than the provisionally estimated margin of dumping.

The Court agrees with plaintiffs' arguments that the ITA failed to carry the burden of demonstrating mootness by establishing that (1) there is no reasonable expectation that the same issue will recur and that (2) interim relief has completely and irrevocably eradicated the effects of the alleged violation and the parties' interest in the underlying question of law. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

The Court is aware that the final results of this administrative review are subject to judicial review independently of other stages in the administrative process. At the same time, there are legal issues which affect conduct of the parties throughout these independent stages of the administrative process. The Court prefers to address such issues as soon as they arise in order to give parties the benefit of an early resolution of issues which could hamper the administrative process.

Because the ITA is required to file a complete administrative record every time it is challenged in this Court, the parties seeking access to the documents which are contained in the administrative record will automatically receive it under the protective order of this Court. If obtaining the access to the ITA calculations is the main issue in a court action, the case would automatically become moot as soon as the administrative record is filed and the protective order is issued. It simply does not make any sense to require parties to initiate a court action in order to obtain access to calculations which form the basis of the ITA determinations.

The Court finds that the parties' access to computer programs and printouts as part of the administrative record of this legal action does not dispose of the urgent issue as to whether the ITA is required to provide parties with a timely disclosure of the computer programs and printouts as part of the administrative process and before a legal action is commenced in this Court.

 The Court finds that Commerce is required to disclose, not only the basic facts and conclusions of law, which form the basis of the final results as published in the *Federal Register,* but also the actual calculations of the dumping margins used during the process of manipulating the factual data in accordance with the law. These calculations are an essential component of the final results and a crucial part of the determination of the actual amount of antidumping duties to be assessed on the subject merchandise.

Section 777 of the Act, 19 U.S.C. § 1677f, is clearly designed to give parties access to the information which forms the basis of determinations by the ITA throughout the administrative proceedings, provided that the necessary precautions against unauthorized disclosures of proprietary information are taken. The ITA is required to establish and follow a procedure which will provide the parties with the necessary access to various documents including the computer programs and printouts which form the basis of the ITA determinations.

(m) *Clerical Errors in Calculation of the Final Results.*

Daewoo and Samsung allege that the ITA made a number of errors in calculations of the final dumping margins. Commerce concedes that the final calculations contain some inadvertent omissions and inconsistent transactions, and requests the Court to remand this determination for corrections.

Zenith and Unions object to a remand for the purpose of correcting the clerical errors on the ground that most of these errors are not clerical errors, but rather the preferred methods of calculations intentionally utilized by the ITA.

The Court will not address each specific error alleged by plaintiffs in view of Commerce's admission of the errors. The Court remands the determination to Commerce for correction of clerical errors.

## IV. ADDITIONAL ARGUMENTS OF ZENITH AND UNION.

(n) *Adjustment for Taxes Forgiven upon Exportation.*

 Plaintiffs Zenith and Union allege that the ITA violated the express require-

ment of Section 772(d)(1)(C) of the Act,[24] when it deducted from FMV the amount of certain Korean taxes, which were forgiven upon exportation of the merchandise to the United States, instead of adding these taxes to the U.S. price of the merchandise. Similarly, plaintiffs allege that the ITA failed to limit the amount of this adjustment by the extent to which "such taxes are added or included in the price of such or similar merchandise when sold in the country of exportation" in violation of the same provision of the law. *Id.*

In support of their arguments, plaintiffs rely on *Zenith Electronics Corp. v. U.S.* 633 F.Supp. 1382 (CIT 1986) in which this court upheld plaintiffs' position with regard to the exact same issues.

The ITA admits that it departed from both the literal application of this provision in the statute and this court's interpretation of that provision in *Zenith.*[25] Commerce justifies its continued adherence to the interpretation which was rejected by the court by repeating the same argument which was raised in *Zenith,* namely, that a literal application of Section 772(d)(1)(C) of the Act would artificially inflate dumping margins in conflict with the Congressional purpose of this section to achieve a tax-neutral computation of dumping margins. Commerce persists "that the ITA's treatment of taxes which have been rebated or forgiven upon exportation is rational and lawful and should have been sustained by the Court in *Zenith*".[26] In addition, Commerce states that the agency has not developed an alternative methodology, because the decision in *Zenith,* did not yet become final. As an alternative to reconsidering the court's decision in *Zenith,* the ITA requests this Court to abstain from remanding this issue to the agency for redetermination until such time as the judgment of this court in *Zenith* becomes final and a new methodology to implement it can be developed by the ITA.

Daewoo and Gold Star attempt to defend the ITA's position by distinguishing the facts of this case from those in *Zenith.* They allege that unlike the Japanese commodity tax involved in *Zenith,* there is substantial evidence on the record that the Korean taxes in question are added to and included in the price of the merchandise in the home market and that the adjustment for the full amounts of these taxes was, therefore, in accordance with the law. This argument, however, does not address the requirement of Section 772(d)(1)(C) that this adjustment has to be determined with regard to the value of the exported merchandise and has to be added to the U.S. price, rather than deducting the amount of taxes imposed on sales in the home market from FMV. Furthermore, the argument of Daewoo and Gold Star that the Korean taxes, unlike the Japanese commodity taxes in *Zenith,* were actually passed-through to Korean purchasers of the merchandise would be relevant if the ITA made such determination in calculating the adjustment. The ITA notice of the final results and the administrative record of this case indicate, however, that Commerce did not attempt to make any such determination, but merely assumed that taxes were passed-through as the best information available. The court held in *Zenith* that the ITA could not make such an assumption without actually attempting to determine whether these taxes were shifted to Korean purchasers according to the specific requirement in the law.

---

**24.** 19 U.S.C. § 1677a(d)(1)(C) states:

**(d) Adjustments to purchase price and exporter's sales price.**—The purchase price and the exporter's sales price shall be adjusted by being—

(1) **increased by**—

\* \* \* \* \* \*

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; ....

**25.** Defendant's Brief in Opposition to the Motions of Zenith and Unions for Judgment upon the Agency Record (the "ITA Brief II") at 7.

**26.** *Id.,* at 9.

The Court will refrain from revisiting the same issues which we addressed in great detail and disposed of in *Zenith, supra.* The ITA does not raise a single argument or factual distinction, which was not addressed in that case, and has not demonstrated the need for reconsideration of those issues. In *Fundicao Tupy et. al. v. U.S. et. al.,* 13 CIT ——, 696 F.Supp. 1525 (1988), the court refrained from addressing the issue as to whether a preliminary injunction should issue with regard to new entries of merchandise when the same relief was denied to the moving party with regard to the entries made during a preceding review period. The court stated: "Since the Court of Appeals has now assumed jurisdiction over this matter, we do not believe that it would be appropriate for this Court to conduct an intra-court review of its previous decision by revisiting these issues." *Id.,* at 9 (footnote omitted).

Similarly, the Court will not delay resolution of this issue within the context of this judicial review, merely because defendant is pursuing an appeal of a judicial precedent which remains controlling until it is overturned. The Court will not allow the ITA to continue rewriting the express requirements of the statute without even attempting to obtain and meet the criteria of the proper procedural relief.

The Court finds that the *Zenith* case is controlling in its holding and reasoning that Commerce's interpretation of Section 772(d)(1)(C) of the Act is not in accordance with the law and that the final results of this administrative review are not supported by the evidence on the record with regard to this issue. The Court remands this issue to the ITA for reconsideration in accordance with this opinion.

### (o) Calculation of the Deposit Rates for Future Entries.

Zenith and Unions argue that the ITA method of calculating the amounts of antidumping duty deposit requirements on future entries of CTRs from Korea violates the legislative purpose and the requirement to collect duties and deposits in the amount by which FMV exceeds U.S. price. Zenith alleges that the straight application of the antidumping duty percentage rates to the invoice prices at which CTRs are entered to the United States ("entered value"), rather than the adjusted or "statutory U.S. price" understates the amount of the deposit requirement.

Zenith contends that the deposit requirement is clearly understated in this case, because the statutory U.S. price of the CTRs is substantially higher than its entered value as a result of the adjustments for Korean taxes which are not collected or rebated with regard to this merchandise upon its exportation to the United States. According to Zenith, therefore, the application of the same percentage rate to the lower amounts of unadjusted entered value of CTRs yields inaccurate and disproportionate amounts of antidumping duty deposit requirements in violation the purpose and intent of the antidumping duty law.[27]

27. Zenith provides the following example to demonstrate the understatement of the deposit requirement:

For example, assume Commerce reviewed only one entry of one Korean CTV [CTR] sold in the review challenged herein. Further, assume that (a) the entered value of that single entered CTV set was $100; (b) Commerce, in calculating statutory USP, added to the $100 entered value approximately $50 as a forgiven tax add-back (in accordance with Zenith's argument *supra* at 8–12), yielding a USP of $150; (c) the comparison FMV is $175, yielding a dumping margin of $25; and (d) the weighted-average percentage margin of dumping on this CTV is, therefore, 16.67 percent ($25 dumping margin as a percentage of $150 statutory USP).

Now, assume that, on the day after this result is published in a final determination, there is a new, one set entry of this same Korean CTV model, again at an entered value of $100. Using Commerce's weighted-average percentage dumping margin (16.67 percent) as determined in the just-completed review, the Customs Service would require a cash deposit of only $16.67 (16.67 percent of entered value) for an estimated antidumping duty. However, the most recent and best information available indicates that the future dumping margin and antidumping duty liability on this new entry will be $25. The proper way to calculate the deposit rate is to express the just-determined antidumping duty ($25) as a percentage of the reviewed entry's entered value ($100), which would have yielded a 25 percent deposit rate and an accurate $25 cash deposit for an estimated antidumping duty on the new entry.

Brief in Chief of Zenith at 13.

The ITA, Daewoo, Gold Star and Samsung allege that this argument should be precluded from being raised in this judicial review, because Zenith and Unions failed to exhaust the administrative remedies by raising this issue during the proceeding below.

Alternatively, Commerce disputes this argument on the merits by stating that it is based on the erroneous premises that the adjusted U.S. prices of the merchandise will always be higher than its entered value and that there is no authorization to rely on the "entered value" of the merchandise. Commerce argues that there is no legal or factual basis for determining whether the deposit rates are understated or overstated until the future entries are reviewed and the actual antidumping duty rates for those entries is calculated. Commerce further alleges that the statutory deposit requirement was never intended to, and could not possibly represent the exact estimate of the antidumping duties which might be due on the future entries of the merchandise and that Congress provided for collection of the difference between the duty deposited and the duty ultimately assessed on the merchandise with interest. 19 U.S.C. § 1673f.

The Court does not agree that Zenith is procedurally precluded from raising this issue in this judicial review. It is not until the final results of the review became published that the basis for this argument arose. It is particularly true in view of the fact that the ITA did not make, and is still opposing, the upward adjustment to the U.S. price for Korean taxes forgiven upon exportation, which would make the statutory U.S. price of the merchandise considerably higher than its entered value.

At the same time, the Court does not find any support for the argument of Zenith that the ITA violated its discretion in calculating *ad valorem* duty deposits by applying the weighted-average rates of antidumping duty to the entered value of the future entries of the merchandise.

The Court finds that it would be both speculative and cumbersome for the ITA, in addition to determining the adjusted U.S. price of entries made during this review period, to make a special finding as to what such adjusted U.S. price might be for the future entries and to convert the current rate of antidumping duty to reflect such estimated adjusted U.S. price.

It would also be speculative to assume that the adjusted U.S. price of the future entries would indeed be increased in the same proportion as in the final results of this review. The statutory U.S. price is subject to various upward and downward adjustments which depend on many factors to be determined during a future review. Until the ITA conducts such a review and determines the adjusted U.S. price for the future entries, it is within Commerce's discretion to apply the rates of these final results to the entered invoice value of the future entries without any additional conversions to account for the difference between the entered value of the merchandise and the adjusted U.S. price to be determined in the future.

The Court concludes that the ITA is reasonably in compliance with Section 751(a)(2) of the Act in applying the rates established in the final results of the subject administrative review to future entries of the merchandise on an ad valorem basis. The Court affirms the final results of the ITA with regard to this issue.

(p) *Adjustment for Rebates in Determination of Sales Below Cost.*

Zenith claims that Commerce failed to account for certain rebates, which were made by Daewoo on its home market sales of the merchandise, in determining whether the home market sales of the merchandise were made below their costs of production. Zenith alleges that many more sales would be excluded from FMV as below costs sales, if the ITA made the proper adjustments for the amount of rebates.

The ITA concedes that it erred by inadvertently omitting the rebates from its below costs analyses and requests a remand to correct this omission.

Daewoo does not defend the ITA's omission of rebates from the costs of production calculations in view of the agency's

request for a remand. At the same time, Daewoo states that these rebates should not be classified as indirect selling expenses, which are added to the overall costs of producing the merchandise, but instead must be considered an aspect of the net sales. Daewoo also advances a number of specific methodologies with regard to calculation of the rebate adjustments, should the Court order a remand.

The Court will not proscribe specific methods of calculating the rebate when remanding this issue to the agency. The specific method of calculating the rebate is not ripe for judicial review. The action challenges the ITA's failure to make an adjustment and the Court shall limit its ruling to this issue. Once Commerce has performed the remand and reported its result to this Court, Daewoo will be able to raise these arguments, if it believes that the remand results are not supported by substantial evidence on the record, or otherwise not in accordance with the law.

The ITA must address this issue on remand and allow the parties to submit their comments with regard to this adjustment.

(r) *Failure to Account for a Second Nameplate on Exported CTRs.*

■ Zenith alleges that the ITA failed to account for the expense of installing a second nameplate on CTRs which were sold by Gold Star in the United States. The ITA does not dispute that these additional nameplates were not installed on CTRs which were sold in the home market.

Zenith argues that, if U.S. price was based on purchase price, the ITA was required to account for the expense of installing the second nameplate on export merchandise by making a difference in merchandise adjustment to FMV pursuant to 19 U.S.C. § 1677b(a)(4)(C). Alternatively, Zenith contends that in transactions involving exporter's sales price, the added value of these additional nameplates should be deducted from the U.S. price pursuant to 19 U.S.C. § 1677a(e)(3).

Commerce concedes that it did not make any determination with regard to this issue during the administrative proceeding be-

low. Commerce asserts, however, that this issue should not be addressed by the Court, because plaintiff failed to raise it during the administrative review in question.

The Court finds that the applicable law requires Commerce to make certain adjustments in its calculations of dumping margins whether or not they were specifically requested by the parties to the proceeding. The ITA's admitted failure to consider this adjustment, notwithstanding the evidence on the record that the CTRs sold in the U.S. market contained these additional nameplates, indicates that the final results are not in accordance with law and not supported by substantial evidence on the record. Since there is no showing that Zenith's failure to raise this issue during the administrative proceeding had prejudiced defendant in any way, the Court will not accept the argument that a failure to raise this issue during the review precludes the Court from reviewing the final results with regard to this issue.

The Court concludes that the ITA's failure to consider the cost of the additional nameplates affixed to the exported CTRs of Gold Star render the final results unsupported by substantial evidence on the record. The ITA is directed to address this issue on remand and make the appropriate adjustments in accordance with the law.

## CONCLUSION

In summary, the Court remands the final results of the administrative review on CTRs from Korea to the ITA for reconsideration in accordance with this opinion with regard to:

(1) the appropriate adjustment to FMV for bad debt losses of Samsung;

(2) treatment of Daewoo's sales below cost of production;

(3) adjustment for the differences in import duties on the parts of CTRs;

(4) adjustment to FMV for the differences in credit expenses of Daewoo and Samsung;

(5) adjustments to FMV for warranty expenses and volume rebates of Samsung;

(6) recalculation of the ESP off-set adjustment to FMV for indirect selling expenses;

(7) reconsideration of the adjustments to U.S. price for the account receivables;

(8) reconsideration of the adjustment to U.S. price for legal expenses;

(9) adjustment to U.S. price for taxes forgiven upon exportation;

(10) adjustment for additional nameplates on CTRs of Gold Star;

(11) correction of clerical errors.

The ITA is required to file its remand results and the administrative record in support thereof within 120 days from the date of this decision. The final results of this administrative review are affirmed in all other respects in accordance with this opinion.

SO ORDERED.