**Slip Op. 00-17**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

———————————————————— :
                                            :
THAI PINEAPPLE CANNING INDUSTRY     :
CORP., LTD., and MITSUBISHI          :
INTERNATIONAL CORP.,                 :
                                            :
      Plaintiffs,              :    Court No. 98-03-00487
                                            :
        v.                    :
                                            :    Public Version
THE UNITED STATES,                   :
                                            :
      Defendant,               :
                                            :
      and                      :
                                            :
MAUI PINEAPPLE CO., LTD., and        :
INTERNATIONAL LONGSHOREMEN'S AND     :
WAREHOUSEMEN'S UNION,                :
                                            :
      Defendant-Intervenors.   :
———————————————————— :

[ITA remand results affirmed in part, reversed and remanded in part.]

Dated: February 10, 2000

    Dickstein Shapiro Morin & Oshinsky LLP (Arthur J. Lafave III, Douglas N. Jacobson, and Patricia M. Steele) for plaintiffs.

    David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau), Christine E. Savage, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

    Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal and David C. Smith, Jr.) for defendant-intervenors.

## OPINION

**RESTANI, Judge:** On May 5, 1999, the court remanded the final results of the Department of Commerce, International Trade Administration ("Commerce" or "the Department") in Canned Pineapple Fruit from Thailand, 63 Fed. Reg. 7,392 (Dep't Commerce 1998) (final results of antidumping duty admin. rev.) [hereinafter "Final Results"].  See Thai Pineapple Canning Indus. Corp. v. United States, No. 98-03-00487, 1999 WL 288772 (Ct. Int'l Trade May 5, 1999) [hereinafter "Thai Pineapple"].[1]  The case concerned a challenge by Thai Pineapple Canning Industry Corp., Ltd. ("TPC") and Mitsubishi International Corp. ("MIC") (collectively "TPC") to the Department's Final Results.  In its remand instructions, the court instructed Commerce to (1) reconsider the date of sale, (2) reconsider the matching of costs to sales on a fiscal year basis for cost of production ("COP") and constructed value ("CV") purposes, and (3) recalculate the constructed export price ("CEP") profit calculation.  Thai Pineapple, 1999 WL 288772, at *11.  Because neither TPC nor Commerce had an adequate opportunity to

---

[1]  Familiarity with the court's earlier opinion is presumed.

address the assessment rate of entries made after the final

determination in the original less-than-fair-value

investigation, that issue was remanded to provide the parties

a further opportunity to brief the issue.  Thai Pineapple,

1999 WL 288772, at *2.  The court upheld Commerce's use of a

single assessment rate for the period of review ("POR").  Id.

at *10-11.

    Commerce issued its remand determination on September 2,

1999.  See Final Results of Redetermination Pursuant to Court

Remand: Thai Pineapple Canning Industry Corp., Ltd., and

Mitsubishi International Corp. v. United States, Court No. 98-

03-00487 [hereinafter "Remand Results" or "RR"].

### Jurisdiction and Standard of Review

    The court has jurisdiction pursuant to 28 U.S.C. §

1581(c) (1994).  In reviewing final determinations in

antidumping duty investigations, the court will hold unlawful

those agency determinations which are unsupported by

substantial evidence on the record, or otherwise not in

accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## I.  Date of Sale

## A.  Background

     In the Final Results, Commerce used the date of contract

for purposes of determining the date of sale for export price

("EP") sales and third country sales.  Final Results, 63 Fed.
Reg. at 7,394-95.  The court found that Commerce's policy as
of the time of its review of TPC was to use invoice date for
date of sale, absent a significant reason to do the contrary.
See Thai Pineapple, 1999 WL 288772, at *5-6.  The court
therefore remanded for Commerce to state whether there was
"another reason for rejecting invoice date" and to "square its
reasoning with its other contemporaneous determinations."  Id.
at *6.  In the Remand Results, Commerce reconsidered the date
of sale determination, and again concluded that "contract date
remains the appropriate date of sale for TPC's third country
sales, based on the record in this case."  RR, at 13.  The
Department states that this decision is consistent with its
date of sale methodology in contemporaneous determinations.
Id.

## B.  Discussion

TPC argues that Commerce has not provided an adequate
explanation for not utilizing invoice date as date of sale in
its remand determination.

The Department announced a new policy, applicable to this
case, of using invoice date for date of sale unless there is
information indicating that date of contract should be used
because all material terms of the sale were firmly fixed at

that time.  See Thai Pineapple, 1999 WL 288772, at *5.  This

policy is now reflected in Commerce's regulations.[2]  19 C.F.R.

§ 351.401(i) (1999).

The announced policy was not applied to this matter

although it was applied to other contemporaneous matters.  See

Thai Pineapple, 1999 WL 288772, at *6.  The new rule

establishes a presumption that invoice date will be the date

of sale.  See 19 C.F.R. § 351.401(i).  If Commerce can

establish "a different date [that] better reflects the date on

which the exporter or producer establishes the material terms

of sale," Commerce may choose a different date.  Id.  Commerce

has cited nothing of substance which indicates sales terms

were fixed at an earlier date.  Nor has it cited any other

credible reason for disregarding its announced presumption.

See Antidumping Duties; Countervailing Duties - Final Rule, 62

Fed. Reg. 27,296, 27,349 (Dep't Commerce 1997) (invoice date

presumption applies "absent satisfactory evidence that the

_____

[2]  Commerce at times states that the policy reflected its
then current practice.  Thus, the court assumes its practice
had evolved over time.  See also Antidumping Duties;
Countervailing Duties - Notice of Proposed Rulemaking and
Request for Public Comments, 61 Fed. Reg. 7,308, 7,330 (Dep't
Commerce 1996) ("This is a change from prior practice under
which the Department based the date of sale on the date on
which the 'essential terms of sale' (normally price and
quantity) were established").

terms of sale were finally established on a different date.")
Commerce does not cite industry practice or a lag between
invoice and shipment, or any other unusual situation,
indicating a date, other than invoice date should be used.
There appears to be no other case in which "rare instances" of
changes after contract date, RR, at 17, was considered
substantial reason to abandon the invoice date presumption.
Under the facts of this case, i.e., rising pineapple costs,
the fact that few purchasers sought changes is meaningless.
The question is could the terms be changed, or were they fixed
at the time of the initial order. See Final Results, 63 Fed.
Reg. at 7,394. The evidence is that the terms could be
changed and were changed in some instances. See Thai
Pineapple, 1999 WL 288772, at *4 & n.11. There was no reason
for Commerce to abandon its presumption in this matter. The
court therefore reverses Commerce's use of date of contract
and directs the Department to use invoice date for date of
sale purposes.

**II. Use of Single Weighted-Average Cost of Production Covering
Entire 18-Month Period of Review**

**A.  Background**

In the Final Results, for COP and CV purposes, Commerce
used a single weighted-average cost for the entire POR. Final

Results, 63 Fed. Reg. at 7,399.  TPC argued that this single

weighted-average cost failed to take into account the rising

cost of fresh pineapple fruit from 1994 through the POR.  Id.

TPC alleged that this resulted in significant distortions in

Commerce's price-cost comparisons.  Id.

The court found that the use of the single weighted-

average cost did not take into account the significant rise in

the cost of pineapple fruit, the primary input of canned

pineapple fruit ("CPF").  Thai Pineapple, 1999 WL 288772, at

*3.[3]  The court also found that Commerce had previously

"adjusted for changes in costs over the POR or matched costs

to POR sales more specifically than it did here."  Id.  The

court noted that in Fujitsu Gen. Ltd. v. United States, 88

F.3d 1034 (Fed. Cir. 1996), the Federal Circuit sustained the

use of annual weighted-average COP in calculating FMV, and

that this was what TPC was seeking: "they want costs for a

fiscal year matched to sales for a fiscal year."  Thai

Pineapple, 1999 WL 288772, at *3.  The court instructed

Commerce to revisit the issue and "reanalyze the data to

_____

[3]  The court noted TPC's calculations reflecting a [   ]%
rise in fresh pineapple costs per carton of CPF from 1994 to
1995 and a [   ]% increase from 1994 to 1996.  The price per
standard carton in 1994 was [   ] baht, [   ] baht in 1995 and
[   ] baht in 1996.  Thai Pineapple, 1999 WL 288772, at *2,
n.4.

determine whether TPC has provided sufficient data to match costs to appropriate fiscal year sales.  If it has, in the absence of any proper antidumping policy reason . . . Commerce must proceed as it has in the past and match fiscal year costs with sales."  Id. at *4.

On remand, Commerce recalculated separate costs for fiscal years 1995 and 1996.  Remand Results, at 11.  "Where CV is the basis for normal value, we have matched 1995 U.S. sales to 1995 CVs, and have matched 1996 U.S. sales to 1996 CVs. With respect to the sales-below-cost test, we have tested 1995 comparison market sales against 1995 costs, and have tested 1996 comparison market sales against 1996 costs."  Id.  Third country sales made in December 1994, and used in the margin calculation, were tested against 1995 costs.  Id.  Commerce stated that it believed 1995 annual costs were representative of  December 1994, "and that the use of December 1994 sales pursuant to the contemporaneity requirement does not warrant a departure from our practice of using POR costs."  Id.  TPC argues that the failure to use 1994 costs does not conform to the court's remand instructions.  Commerce counters that its longstanding policy is to use costs incurred during the POR for its COP and CV costs analysis.  Remand Results, at 12.

**B.  Discussion**

The matching of costs actually puts two issues before the court: 1) the basis on which sales must be matched to costs (i.e. fiscal year, semi-annually, etc.) and 2) whether costs incurred outside of the POR, or period of investigation ("POI"), should be matched to the sales made during the same year whether or not the sales are within the POI or the POR. The court ruled on the first issue in Thai Pineapple, and on remand Commerce generally used fiscal year costs.  The court finds that the use of fiscal year costs adequately addresses the issue of TPC's rising pineapple costs, and sustains the use of separate weighted-average costs for 1995 and 1996.  The Department's decision to use only POR costs, however, now raises the second issue.

Sections 1677b(b)(3)(A) and 1677b(e)(1) of Title 19 require that in calculating COP and CV, the Department use costs "during a period which would ordinarily permit the production" of the foreign like product or the merchandise, "in the ordinary course of business."  19 U.S.C. § 1677b(b)(3)(A) & 1677b(e)(1) (1994).  The period to be used is not further defined in the statute, nor does the statute dictate the methodology Commerce must use to calculate COP or CV.  See AK Steel Corp. v. United States, No. 96-05-01312,

1997 WL 728284, at *5 (Ct. Int'l Trade Nov. 14, 1997) (statute

does not "address the method by which Commerce must calculate

the COM" for either COP or CV).  Therefore, pursuant to

Chevron U.S.A. Inc. v. Natural Resources Defense Council,

Inc., 467 U.S. 837, 842-43 (1984), the court must defer to the

agency's reasonable interpretation of this statute.  Commerce

is directed, however, to determine COP as "accurately as

possible."  Cinsa, S.A. de C.V. v. United States, 966 F. Supp.

1230, 1239 (Ct. Int'l Trade 1997) (quoting Timken Co. v.

United States, 18 CIT 1, 10, 852 F. Supp. 1040, 1049 (1994)).

Commerce states that its longstanding practice is to use the

cost of manufacturing ("COM")[4] during the POI/POR for its COP

---

[4]  Commerce's standard practice in calculating COP and CV
is to use COM, rather than cost of goods sold ("COGS"),
because COM "represents the cost to manufacture the product
during the period."  Certain Preserved Mushrooms from
Indonesia, 63 Fed. Reg. 72,268, 72,273 (Dep't Commerce 1998)
(notice of final determination of sales at LTFV).  The
Department states that it does not generally use COGS because
of concerns over the inclusion of the value of inventory from
a previous period.  Id.  COGS is an accounting method used to
measure costs.  Inventory value is an issue when using COGS
because COGS is calculated by "(1) adding the cost of goods
manufactured to the beginning finished goods inventory so as
to find the total amount available for sale and then (2)
subtracting the ending finished goods inventory."  Robert N.
Anthony & James S. Reece, Accounting Principles 146 (6th ed.
1989).  Because inventory can be valued in different ways,
Commerce expresses concern that costs based on COGS may vary
depending on the method selected.  Gov't Supplemental Br. at 5
(citing Accounting Principles at 151: "the choice of
                                                (continued...)

and CV calculation.  The fact that a practice is longstanding, however, is only justification for the practice's use if it is also reasonable and in accordance with law.  See Mitsubishi Heavy Indus., Ltd. v. United States, 15 F. Supp.2d 807, 813-14 (Ct. Int'l Trade 1998) (approving Commerce's test because it was both longstanding and consistent with law).

Commerce analyzes costs based on the cost to produce the merchandise during the period in which sales are being made, "as opposed to the cost to produce each of the particular sales made during the reporting period."  Remand Results, at 12.  Commerce therefore requests that respondents report the weighted average production data based on costs incurred during the POI/POR.  Stainless Steel Bar from Spain, 59 Fed. Reg. 66,931, 66,938 (Dep't Commerce 1994) (notice of final

---

[4](...continued)
[inventory] method can have a significant effect on net income.").  In contrast, using COM during the period "normally covers the period needed to produce the subject merchandise just prior to export and excludes the changes in inventory." Mushrooms, 63 Fed. Reg. at 72,273.

The court requested further briefing on the Department's use of COM, rather than COGS, which clarified that TPC did not, in fact, request that Commerce utilize a COGS methodology.  Although TPC says that COGS would be a more appropriate methodology, it submitted its costs based on COM for each fiscal year (1994, 1995, and 1996) and it requests that separate fiscal year COM be used for each period.  TPC Supplemental Br. at 4, 5, & 9.  The court, therefore, need not resolve whether COGS should be used.

determination of sales at LTFV).  Commerce departs from this

practice in unique circumstances, "such as when production did

not occur during the period of investigation."  Id.  "[A]bsent

strong evidence to the contrary, the Department assumes that

the cost structure during the POI is representative and can be

used to calculate an estimate of the cost of production."  Id.

Commerce recognizes that the statutory language is broad

enough to accommodate calculating COP and CV on a different

basis, but it has chosen to use costs during the POR/POI as a

"consistent and predictable approach."  Remand Results, at 27.

> In some instances, the cost of manufacturing the
> particular product sold during the POR/POI is higher than
> the cost of the identical product manufactured during the
> POR/POI; however, sometimes it is lower.  We believe that
> having a consistent and predictable approach as to which
> method we use eliminates results-oriented arguments
> regarding which approach to take in a given case.

Id.

     In requesting that Commerce deviate from the standard

practice in this case, TPC relies principally on two

determinations: Sweaters Wholly or in Chief Weight of Man-Made

Fiber from Taiwan, 55 Fed. Reg. 34,585 (Dep't Commerce 1990)

(final determination of sales at LTFV) [hereinafter

"Sweaters"] and Fresh and Chilled Atlantic Salmon from Norway,

58 Fed. Reg. 37,912 (Dep't Commerce 1993) (final results of

antidumping duty admin. rev.) [hereinafter "Salmon"].  The

court found that these determinations supported an adjustment

for changes in costs over the POR and matching costs to sales

more closely than was done in the original Final Results.  See

Thai Pineapple, 1999 WL 288772, at *3-4.

In Sweaters, the Department departed from using annual

average unit costs because there was a significant variation

between what was produced during the POI and what was sold

during the POI.  55 Fed. Reg. at 34,596.  Instead the

Department used actual costs incurred during the period of

production.  Id.  This reasoning, however, does not require

using costs from outside the POR in the case of TPC because

there was no difference between the CPF produced during the

POR and the CPF sold during the POR.  In Salmon, the

Department did not use a single cost of cultivation ("COC")

for the entire eighteen month POR.  The court discussed

Salmon in Thai Pineapple and found the reasoning in Salmon

justified a closer matching of costs to sales:

> [G]iven the fluctuations of farmers' costs during the
> POR, the ease with which different generations' COC can
> be segregated and the fact that we have calculated
> separate 1990 and 1991 processing costs for respondent .
> . . we believe that it is reasonable to use separate 1990
> and 1991 COCs.

Thai Pineapple, 1999 WL 288772, at *4 (quoting Salmon, 58 Fed.

Reg. at 37,913).  Commerce's explanation that the

particularity of salmon cultivation (a typical salmon harvest averages eighteen to twenty-four months),[5] requires the use of non-POR costs is reasonable.  CPF does not have the particularities of the subject merchandise in Sweaters or Salmon which would necessitate the use of non-POR costs.[6] Moreover, a closer matching of costs to sales was achieved upon remand in this case.

TPC insists that the Department should have used 1994 COM in the calculation of CV for comparison with U.S. sales of goods manufactured in 1994[7] and for the COP calculation for testing third-country sales of goods manufactured in 1994.[8]

---

[5]  Fresh and Chilled Atlantic Salmon from Norway, 56 Fed. Reg. 7,661, 7,662 (Dep't Commerce 1991) (final determination of sales at LTFV) ("Because the growth cycle of the subject merchandise is approximately 18 to 24 months, we requested production costs for the previous two to three years").

[6]  In Stainless Steel Bar from India, Commerce also deviated from its usual practice and used cost information from outside the POR because of limited production of the subject merchandise during the POR.  62 Fed. Reg. 4,029, 4,030-31 (Dep't Commerce 1997) (final results of new shipper antidumping duty admin. rev.).  Limited production is not a concern in the case of TPC.

[7]  Although TPC speaks of goods manufactured in 1994, the record does not reveal in which year goods were manufactured.

[8] TPC had reported five months of third-country sales invoiced in 1994.  TPC Br. at 9-10.  This was in response to Commerce's request that TPC report all sales in the third-country for a period commencing 90 days prior to the first
(continued...)

TPC Comments at 2.  TPC states that sales observations with
invoice dates in October through December of 1994 "were
excluded pursuant to the sales below cost test."  TPC Comments
at 6 n.6 & Ex. 1 (citing Commerce's "Below Cost HM Sales"
table).  TPC alleges that the 1995 costs are not
representative of 1994 sales.  Although TPC's 1994 weighted-
average costs may be somewhat lower than the 1995 costs,[9] this
is not an investigation of 1994 sales, and only very year-end

_____

[8](...continued)
date of sale in the United States.  Because Commerce based
date of sale on date of contract, and the date of contract
preceded the date of entry into the United States by several
months, "the first date of sale on an EP sale to the United
States [resulting in an entry] during the POR . . . took place
in November 1994 and TPC was required to report sales in
Germany commencing with invoices issued in August 1994, 90
days before."  TPC Br. at 10, n.25.  The "90/60" day
contemporaneity window exists because Commerce limits the
universe of potential matches to those sales "within 90 days
before and 60 days after the month of the U.S. sale."  E.I.
DuPont de Nemours & Co. v. United States, No. 96-11-02509,
1998 WL 42598, at *13 (Ct. Int'l Trade Jan. 29, 1998).

[9]  The finished product costs rose by [   ]% from 1994 to
the first half of 1996, but only rose by [   ]% from 1994 to
1995.  Thai Pineapple, 1999 WL 288772, at *2 n.4.  Using
separate fiscal year costs has therefore narrowed the cost
increase experienced by TPC because 1995 costs were used
instead of the single weighted-average cost for the entire
POR.

1994 third-country and U.S. sales were used in the margin

calculation.[10]  Remand Results, at 11.

Because the statute permits Commerce to determine the

period "which would ordinarily permit the production" of the

foreign like product or the merchandise, "in the ordinary

course of business," it was not unreasonable, under the facts

of this case, for Commerce to select fiscal years within the

POR as the relevant period for calculating costs.  The court

finds that in this case, using separate 1995 and 1996 costs

sufficiently accounts for the rising pineapple costs incurred

by TPC, and complies with the court's remand instruction to

"match fiscal year costs with sales."  Thai Pineapple, 1999 WL

288772, at *4.  The court does not find that the circumstances

of this case warrant using costs from outside of the POR, and

therefore sustains Commerce's calculation of COP and CV based

on 1995 and 1996 COM.

---

[10]  It is not clear what effect using invoice date for
date of sale will have on the use of sales and costs from
outside the POR.

**III. Inclusion of U.S. Interest Expenses in Denominator of CEP Profit Ratio**

**A.  Background**

The court found that Commerce's calculation of CEP profit differed from the approach set out in the statute.  Thai Pineapple, 1999 WL 288772, at *7 (citing 19 U.S.C. § 1677a(f)(1)-(2)(A) (1994)).  In the Final Results, Commerce calculated CEP profit by computing the ratio of total profit to total expenses and multiplying that ratio, on a transaction-by-transaction basis, by reported U.S. selling expenses.  Final Results, 63 Fed. Reg. at 7,395.  The court held that the statute intended that "profit would be allocated to U.S. sales in the same ratio as United States selling expenses are to total expenses."  Thai Pineapple, 1999 WL 288772, at *7.  Furthermore, 19 U.S.C. § 1677a(f) requires that the "statutory ratio applied to 'actual profit' for purposes of calculating CEP profit must be calculated on a proportional basis."  Id. at *8.  Commerce was directed to demonstrate on remand that the total expense denominator of the ratio to be applied to total actual profit to obtain the CEP profit adjustment contains all interest expenses (including those relating to U.S. sales) as required by 19

U.S.C. § 1677a(f)(2)(C).  Thai Pineapple, 1999 WL 288772, at *9.

## B.  Discussion

For cost of production purposes respondent reports total interest expenses covering inventory carrying costs and credit extension expenses.  See TPC Section D Questionnaire (Sept. 5, 1996), at D-25, field 10.0, P.R. Doc. 11 (requesting net interest expense incurred by company in connection with production and sale of foreign like product).[11]  For price adjustment purposes, however, Commerce requires respondents to impute interest expenses separately for U.S. sales, even though companies may not account for such expenses separately, because, inter alia, relevant differences between U.S. and

---

[11]  Commerce states in the Remand Results that the annual interest amount reported as part of COP/CV reflects the costs of carrying merchandise in inventory and extending credit for the following reasons:

> The annual interest expense incurred by a company, and reported as an element of COP/CV, will reflect the extent to which the company does not immediately receive payment upon production of the merchandise, i.e., the opportunity cost of having the merchandise sit in inventory prior to sale, and of extending credit after the sale.  To the extent that a company incurs a longer waiting period between production and payment, it will not have recourse to such funds and will generally incur greater financial expenses relative to receiving payment immediately upon production.

RR, at 20-21.

"home" market sales must be accounted for.  See e.g., 19 U.S.C. § 1677b(a)(6)(C)(iii) (1994) (circumstances of sales adjustment).  It is this separate U.S. sales figure which TPC wishes included in the denominator.  It also appears true, as TPC alleges, that the manner of calculating U.S. imputed interest expenses may result in some cases in amounts which are not fully reflected in the total interest expenses figure which is used in the denominator of the CEP profit ratio.  See TPC Section C Questionnaire (Sept. 5, 1996), at C-21, field 36.0, P.R. Doc. 11 (Commerce's instructions regarding reporting U.S. credit expense).  Nonetheless, Commerce argues its method will avoid double counting, and that also appears to be true as to the normal case.

Theoretically, the total expenses denominator would reflect the interest expenses captured in the U.S. sales expenses numerator specified in 19 U.S.C. § 1677a(f)(2)(B), as well as "home" market interest expenses, because the total expenses denominator is derived from a net unit figure based on all company interest expenses without regard to sales destination. The lines of computer program results cited by Commerce generally support the theory.  See RR, at 23 n.21 (citing computer lines from Computer Program for Draft Results of Redetermination which show inclusion of interest expenses

in COP, inclusion of interest expense in U.S. cost and CV, and inclusion of these costs in "Total Expenses" in the CEP profit calculation).[12]   The issue is whether there is some peculiarity of this case that belies the relevancy of the theory.

TPC has not established that there is any great discrepancy here.  For example, it does not demonstrate a distortion caused by differing expenses over time.  Nor does it allege that in this case there can be no double counting because it had no or little actual U.S. interest expenses, but only imputed U.S. expenses.[13]  Plaintiff alleges nothing to counter Commerce's reasoning on this point.  Accordingly, the court sustains Commerce's CEP profit calculation.

**IV. Assessment rate for entries made after the final LTFV determination**

**A.  Background**

The remaining issue on remand relates to the propriety of Commerce's assessment rate calculations.  Commerce increased the cash deposit rate for entries of subject merchandise made after the final less than fair value ("LTFV") determination,

---

[12]   There was no change in the draft margin program from the draft remand results to the final remand results.  See Declaration of Gabriel Adler (Nov. 24, 1999), at ¶ 3, Attach. 2 of Commerce's letter to the court dated Nov. 29, 1999.

[13]   The court does not address whether these are truly distortive situations.

but before the International Trade Commission ("ITC") final affirmative injury determination. Remand Results, at 2. This rate was higher than the estimated duty rate from the preliminary LTFV determination. Compare Notice of Amended Preliminary Determination: CPF From Thailand, 60 Fed. Reg. 9,820, 9,821 (Dep't Commerce 1995) (all others rate 3.92 percent) with Final Determination of Sales at LTFV: CPF From Thailand, 60 Fed. Reg. 29,553, 29,571 (Dep't Commerce 1995) (all others rate 25.76 percent).[14] The statute establishes a cap period for the assessment rate on entries made between Commerce's preliminary LTFV determination and the ITC's final affirmative injury determination. See 19 U.S.C.A. § 1673f(a) (West Supp. 1999).

The court remanded the issue regarding assessment rates during the cap period to allow the parties an adequate opportunity to address the issue. Thai Pineapple, 1999 WL 288772, at *2. TPC argues that Commerce erred in adopting the

---

[14]    The amended preliminary LTFV determination was published on February 22, 1995, the final determination was published on June 5, 1995, and the ITC's final affirmative injury determination was published on July 19, 1995. See CPF From Thailand, 60 Fed. Reg. at 9,820 (notice of amended prelim. determination); CPF From Thailand, 60 Fed. Reg. at 29,553 (final determination of sales at LTFV); CPF From Thailand, 60 Fed. Reg. 37,073 (ITC 1995) (ITC determination of material injury).

second and higher assessment rate as the cap for entries made after the final determination, but before the ITC's final injury determination.  TPC contends that the statute requires that Commerce cap the amount of duties collected at the rate established in the preliminary LTFV determination.

## B.  Discussion

Commerce's longstanding practice has been to calculate separate assessment rates during the cap period: one for the time between the preliminary and final determination, and another between the final determination and the ITC's final determination.[15]  That the practice is longstanding is not sufficient to justify its application, however, it is also reasonable.  See Mitsubishi, 15 F. Supp.2d at 813-14 (approving Commerce's test because it was both longstanding and consistent with the law); cf. Sonco Steel Tube Div. v. United States, 12 CIT 745, 749-52, 694 F. Supp. 959, 962-65

---

[15]  Commerce's expression of this policy dates back to 1986.  See Antidumping Duties; Proposed Rule, 51 Fed. Reg. 29,046, 29,051 (Dep't Commerce 1986) ("dumping margin established in the Secretary's final determination becomes the maximum amount which the Secretary may assess on entries made between publication of that determination and the publication of the Commission's final affirmative determination); Antidumping Duties; Final Rule, 54 Fed. Reg. 12,742, 12,757 (Dep't Commerce 1989) ("For an entry made after the final determination, the cash deposit or bond is set by the Department's final determination.").

(1988) (rejecting ITA argument regarding longstanding practice because practice not explained).

The statutory section at issue is the "Deposit of estimated antidumping duty under section 1673b(d)(1)(B) of this title," which provides as follows:

> If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated antidumping duty under section 1673b(d)(1)(B) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission [ITC] under section 1673d(b) of this title is published shall be —
>
> > (1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or
>
> > (2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order.

19 U.S.C.A. § 1673f(a).  Commerce's regulation, in effect during the first administrative review, states the Department's interpretation of this section.  See 19 C.F.R. § 353.23 (1996).  It provides that if the duties assessed in either the preliminary or final determination by Commerce

differ from the duties assessed in an administrative review, Commerce will instruct Customs accordingly.[16]

Section 1673b(d) addresses the effect of Commerce's preliminary determination in the LTFV investigation. 19 U.S.C. § 1673b(d) (1994). Under section 1673b(d), if Commerce's preliminary determination is affirmative, Commerce estimates the weighted average dumping margin for exporters and producers individually investigated, and determines an all-others rate. 19 U.S.C. § 1673b(d)(1)(A)(i)-(ii).

---

[16]    The regulation states in relevant part:

If the cash deposit or bond required under the Secretary's affirmative preliminary or affirmative final determination is different from the dumping margin the Secretary calculates under § 353.22 [administrative review of orders and suspension agreements], the Secretary will instruct the Customs Service to disregard the difference to the extent that the cash deposit or bond is less than the dumping margin, and to assess antidumping duties equal to the dumping margin calculated under § 353.22 if the cash deposit or bond is more than the dumping margin.

19 C.F.R. § 353.23 (1996) (emphasis added).

The current version of this regulation, 19 C.F.R. § 351.212(d) (1999), differs slightly from the 1996 version. The 1999 version includes a description of the provisional measures deposit cap in countervailing duty cases. The 1999 version also clarifies that the duties assessed under the preliminary or final determination are "provisional duties," while the duties assessed in an administrative review are "final duties." Otherwise, there has been no substantive change to this regulation.

Commerce then orders the posting of a cash deposit, bond, or other security, and the suspension of liquidation of entries. 19 U.S.C. § 1673b(d)(1)(B)-(2).  Pursuant to 19 U.S.C. § 1673d (1994), at the time of Commerce's final affirmative determination, Commerce again determines the estimated weighted average dumping margin and orders the posting of a cash deposit, bond, or other security on entries of subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate.  19 U.S.C. § 1673d(c)(1)(B)(i)-(ii).

The court has previously determined that nothing in section 1673f(a) prevents Commerce from applying two different assessment caps and, indeed, that this practice is reasonable and in accordance with law.  See Daewoo Elecs. Co. v. United States, 13 CIT 253, 712 F. Supp. 931 (1989), aff'd in part, rev'd on other grounds, 6 F.3d 1511 (Fed. Cir. 1993).[17]  The plaintiff in Daewoo presented the same types of arguments as TPC does here, asserting that the language of section 1673f(a) requires that the assessment rate be capped at the rate

---

[17]     Daewoo interpreted the 1988 version of the statute. For the reasons discussed herein, the differences between the 1994 and 1988 statutory sections at issue are inconsequential. Therefore the court finds that the differences in the statute do not affect the Daewoo court's analysis.  All references to the statute will be to the 1994, or most recent version.

established in the preliminary determination.  <u>Daewoo</u>, 13 CIT

at 275, 712 F. Supp. at 951.  The actual assessment of

antidumping duties does not occur until Commerce conducts its

first administrative review of entries subject to an

antidumping order.  <u>Id.</u> at 276, 712 F. Supp. at 952.  The

court in <u>Daewoo</u> held that 19 U.S.C. § 1673f(a) does not

"impose a limitation on the actual assessment rate by the

rates established in the ITA preliminary determination, but

requires only that the amount of duties assessed on entries

made prior to the ITC final determination should be

'disregarded, to the extent the cash deposit collected is

lower than the duty.'" <u>Id.</u> (quoting 19 U.S.C. § 1673f(a)(1)

(1988)).

     Section 1673b(d) authorizes Commerce to order the

suspension of liquidation and the collection of a cash

deposit, bond, or other security, pursuant to the Department's

preliminary affirmative determination.  19 U.S.C. § 1673b(d).

In <u>Daewoo</u>, the court found that the reference to 19 U.S.C. §

1673b(d)(2) in 19 U.S.C. § 1673f(a) did not "limit Commerce's

authority to adjust those preliminary rates in their

subsequent final determination in LTFV investigations."

<u>Daewoo</u>, 13 CIT at 277, 712 F. Supp. at 952.  The court also

noted that the legislative history to 19 U.S.C. § 1673b(d)(2)

supported the conclusion that the preliminary deposit rates could be adjusted when more accurate information became available.  Id. (citing S. Rep. No. 96-249, at 65 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 451).  Moreover, 19 U.S.C. § 1673d(c)(1)(C) authorizes Commerce to order the suspension of liquidation and the posting of the cash deposit after a final affirmative determination where there has been a negative preliminary determination.  Section 1673d(c)(1)(C) references the authorization provision of section 1673b(d)(2) regarding the suspension of liquidation.  In Daewoo, the court held that the reference to this authorization provision in section 1673b(d) "indicates that that provision granted Commerce a continuing authority to suspend liquidation and to collect estimated duty deposits."  Daewoo, 13 CIT at 277, 712 F. Supp. at 953.

TPC maintains that Daewoo was wrongly decided, based on a plain reading of 19 U.S.C.A. § 1673f(a).  Relying on Chevron, 467 U.S. 837, TPC asserts that the court erred when it looked to legislative history because the statute is clear, preventing the need to look beyond its plain language.  The court does not agree.  As noted by Commerce, the statute is silent with regard to the application of a cap between the time of Commerce's final determination and the ITC's final

determination.  The court in Daewoo therefore properly considered the legislative history in determining that Commerce's practice was in accordance with law.

In Daewoo, the court carefully analyzed the interplay of section 1673f(a) with sections 1673b and 1673d, as well as the overall structure and purpose of the statute.  Daewoo, 13 CIT at 276-77, 712 F. Supp. at 952-53.  The court noted that plaintiff's arguments ignored "the provisional nature of duties which are imposed as a result of the final determination and which also serve merely as estimated duty until the actual assessment rates are established as a result of the administrative review."  Id. at 278, 712 F. Supp. at 953.  Plaintiff's interpretation of 19 U.S.C. § 1673f(a) in Daewoo would have rendered "meaningless the meticulous calculations required under the Act in both the final determinations of LTFV investigations and final results of the first administrative review."  Id.[18]

---

[18]  As noted by Commerce in one of its early applications of the two-cap policy, the policy results in a more accurate assessment of estimated duties.

> [B]ecause the dumping margin established in the final determination is based on verified information afte[r] all the parties have had an opportunity to comment, it is a better estimate of the degree of price discrimination than the preliminary deposit rate, which was based only
>
> (continued...)

TPC alternatively argues that the changes made to the statute, pursuant to the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), require that Commerce change its interpretation of section 1673f(a). The court finds that the changes to the relevant statutory provision were minor, and do not undercut Commerce's practice. The changes made to 19 U.S.C.A. § 1673f(a)(1)-(2), by amendment in 1996, are inconsequential.  For example, the amendment replaced the words "cash deposit" for "cash deposit, bond, or other security."  Compare 19 U.S.C.A. § 1673f(a)(1)-(2) (West Supp. 1999) with 19 U.S.C. § 1673f(a)(1)-(2) (1988).

The amendments made to 19 U.S.C. § 1673b(d) were also minor.  The subsection was restructured and renumbered, and the 1994 version states with greater clarity the Department's

---

[18](...continued)
on the best information available to the Department at that time.  Accordingly, once the final determination is published, estimated duties are collected . . . until the order is issued at the final, rather than the preliminary rate.

Color Television Receivers from Taiwan, 51 Fed. Reg. 46,895, 46,903 (Dep't Commerce 1986) (final results of antidumping duty admin. rev.), aff'd in part and remanded in part, AOC Int'l Inc. v. United States, 13 CIT 716, 722-24, 721 F. Supp. 314, 319-21 (1989) (adhering to reasoning of Daewoo), rev'd on other grounds, Zenith Elecs. Corp. v. United States, 77 F.3d 426 (Fed. Cir. 1996).

responsibilities after a preliminary affirmative

determination.  Compare 19 U.S.C. § 1673b(d) (1994) with 19

U.S.C. § 1673b(d) (1988).  Likewise the 1994 amendments to 19

U.S.C. § 1673d(c) do not alter the meaning of this section.

Compare 19 U.S.C. § 1673d(c) (1994) with 19 U.S.C. § 1673d(c)

(1988).  TPC makes much of the differences between section

1673d(c)(1)(B) (1988) and section 1673d(c)(1)(B)-(C) (1994).

Sections 1673d(c)(1)(B)-(C) of the statute state the effect of

a final affirmative determination by Commerce.  The 1988

version of the statute grouped together Commerce's authority

to order the suspension of liquidation and the posting of a

cash deposit, bond, or other security, in cases where it made

an affirmative final determination after a negative

preliminary determination.[19]  19 U.S.C. § 1673d(c)(1)(B)

(1988).  The current version of the statute states that in

cases of a final affirmative determination, Commerce will

order the posting of a cash deposit, bond, or other security.

19 U.S.C. § 1673d(c)(1)(B) (1994).  In the following

---

[19]  "(B) in cases where the preliminary determination by the administering authority under section 1673b(b) of this title was negative, the administering authority shall order under paragraphs (1) and (2) of section 1673b(d) of this title the suspension of liquidation and the posting of a cash deposit, bond, or other security."  19 U.S.C. § 1673d(c)(1)(B) (1988).

subsection, the statute provides that in cases of a negative preliminary determination, Commerce will order the suspension of liquidation under the authorization provision of section 1673b.[20]  Id.

TPC asserts that the differences in the 1994 statute require that the court's reasoning in Daewoo be discarded.  In referring to situations where the preliminary determination is negative and the final determination is affirmative, the 1994 statute only states that Commerce shall order the suspension of liquidation, without stating that Commerce shall order the posting of the cash deposit, bond, or other security.  The

---

[20]    The statute currently reads, in relevant part:

(c) Effect of final determination
        (1) Effect of affirmative determination by the administering authority

        If the determination of the administering authority under subsection (a) of this section is affirmative, then - . . .
        (B)(ii) the administering authority shall order the posting of a cash deposit, bond, or other security . . . for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable, and
        (C) in cases where the preliminary determination by the administering authority under section 1673b(b) of this title was negative, the administering authority shall order the suspension of liquidation under section 1673b(d)(2) of this title.

19 U.S.C. § 1673d(c) (1994).

court does not agree that this formulation alters the holding in <u>Daewoo</u>.  New section 1673d(c) is more properly read to mean that regardless of the preliminary determination result, Commerce orders the posting of a cash deposit, bond, or other security at the time of a final affirmative determination. Commerce does not need to order the suspension of liquidation in a case where the preliminary determination was affirmative, because liquidation would already have been suspended under section 1673b(d)(2).  19 U.S.C. § 1673b(d)(2).  Section 1673d(c)(1)(C) singles out suspension of liquidation in referring to situations where the preliminary determination was negative and the final determination affirmative, because in such a case the suspension of liquidation would not have already occurred.  <u>See</u> 19 U.S.C. § 1673d(c)(1)(C).  Therefore, the change to this section of the statute has not altered the basic meaning of the provision, rather, it has clarified Commerce's responsibilities upon making a final affirmative determination.

None of the changes to the statute regard the Department's assessment rate capping policy for entries made after Commerce's final LTFV determination, but before the ITC's final injury determination.  Commerce's interpretation and application of 19 U.S.C.A. § 1673f(a) is reasonable.  If

Congress objected to Commerce's longstanding practice regarding assessment caps, and intended to change that practice, it likely would have expressed such an intent in the legislative history, if not within the statutory language itself.  The House Report to the URAA states that sections 1673b and 1673d (sections 733 and 735 of the Tariff Act) were amended to conform U.S. law more closely to the Uruguay Round Agreement, and does not indicate any substantive change in U.S. practice.  H.R. Rep. 103-826(I), at 50-51 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 3822-23.

TPC cites no legislative history to support its position that the 1994 URAA amendments reflect an intent to change Commerce's practice under section 1673f(a).  Because Commerce's practice of applying two assessment cap rates is reasonable, conforms to the statute, and results in a more accurate assessment rate, and because TPC offers no weighty arguments in its favor, TPC does not persuade this court that Commerce's policy should be changed.

For the foregoing reasons, the court upholds Commerce's capping the assessment rate between the time of the final LTFV determination and the ITC's final injury determination at the final LTFV rate.

## Conclusion

The court finds that there was no reason for Commerce to abandon its presumption of using invoice date for date of sale, and therefore reverses Commerce on this issue. Commerce must use invoice date for date of sale purposes on remand.

The court upholds Commerce's use of fiscal year costs for COP and CV purposes, and the calculation of CEP profit, as well as Commerce's practice regarding the assessment rate applied during the cap period.

Remand results are due within 30 days. Objections thereto are due 15 days thereafter and responses 11 days thereafter.

_____
Jane A. Restani
JUDGE


Dated:  New York, New York

    This 10th day of February, 2000.